**Harold F. EVANS, Jr., Plaintiff,**

v.

**STATE OF CONNECTICUT, et al., Defendants.**

**No. 5–90–CV00027.**

United States District Court, D. Connecticut.

July 11, 1996.

Laviano Law Offices, P.C. by William M. Laviano, Ridgefield, CT, for plaintiff.

Richard Blumenthal, Attorney General of the State of Connecticut by Margaret Quilter Chapple, Assistant Attorney General, Stamfort, CT, for defendants.

## OPINION

MOTLEY, Senior District Judge, Southern District of New York, Sitting by Designation in the District of Connecticut.

## I. FINDINGS OF FACT

After hearing the testimony and weighing the evidence, exhibits received in evidence and the credibility of the witnesses, the court makes the following findings of fact:

### A. The Parties.

Plaintiff Harold Evans is a 38-year-old black male who was hired by the Connecticut State Police in December of 1985.

He graduated from high school in Connecticut, attended Howard University for two years and then transferred to the American University in Washington, DC, from which he graduated with a B.S. in Administration of Justice in 1980. (R. 1/12/94 at 25–26). While at American University, plaintiff was employed as a special police officer for the campus security force, through which he attended a supervisor's training course at Northern Virginia Community College. (R.

1/12/94 at 35). In 1981, plaintiff attended the Newtown (CT) Municipal Police Training Academy, graduated, and became a member of the Town of Newtown Police Department where he was employed as a police officer for four years and nine months. (R. 1/12/94 at 26–27). During his service with the Newtown Police, plaintiff completed several additional training programs. (R. 1/12/94 at 38–44). In July 1985, plaintiff was accepted for enrollment at the Connecticut State Police Academy for training as a State Trooper.

Defendants are the Connecticut Department of Public Safety (DPS), the Connecticut State Police ("the police department" or "the state police") and the Commissioner of Public Safety, in his official capacity. (Hereinafter, collectively "the defendants"). The police department is organized under the DPS in a "quasi-military fashion." (R. 1/18/94 at 19). Although the personnel and structure of the police high command has changed somewhat over the last ten years, it appears that at the time of plaintiff's tenure, the head of the police department, Lt. Col. Mulligan, was the deputy commissioner of the DPS. Mulligan was responsible for and had the sole authority to terminate troopers and trooper trainees. (R. 1/24/94 at 27–29, 35–36). Under Mulligan were several majors, responsible for District Command, of which there are three in the state. Below the District Command is the "troop", of which there are eleven in the state, each led by a lieutenant with six sergeants as supervisors of the trooper and detective staff. (R. 1/18/94, at 18–20).

In order to provide background information on the racial composition of the police force, plaintiff introduced records, including several consent decrees, from a class action suit filed in the early 1980s. (*See* Pl.'s Exh. 21. (documents related to *Men and Women for Justice, Inc. v. Lester Force*, Civ. Action No. N–82–171 (D.Conn.)). There, plaintiffs had alleged, *inter alia*, that the police department had engaged in discriminatory practices in refusing to recruit or hire a sufficient number of blacks and latinos. (*See* Pl.'s Exh. 21 (*Men and Women for Justice*, *supra.*, Consent Decree, dated February 10, 1984, at 2)). In order to remedy such alleged discriminatory practices, the parties entered

into a consent decree which required the police department to "make future appointments of qualified minorities and non-minorities to the position of State Trooper Trainee in order to reach the goal that at least 10% of the persons serving as sworn personnel in the Connecticut State Police Department are minorities." (*Id.* at 3).[1]

Further background information on the police force, obtained by plaintiff through discovery, revealed serious discrepancies in the manner in which white troopers and troopers of color were disciplined during the years 1985–1987. (Plf.'s Exh. 11).[2] In 1985, there were 846 white "sworn employees" (or troopers), 39 blacks, 21 hispanics and 3 "other"; in 1986, there were 881 white "sworn employees" (or troopers), 42 blacks, 23 hispanics and 4 "other"; in 1987, there were 906 white "sworn employees" (or troopers), 45 blacks, 13 hispanics and 4 "other". (R. 1/13/94 at 72). With regard to discipline: in 1985, there were 70 cases of discipline, with 60 of them involving white troopers and 10 "minorities"; in 1986, 53 total cases, with 36 involving whites and 17 minorities; in 1987, 57 cases of discipline, 44 white troopers and 13 minorities. (Pl.'s Exh. 11; R. 1/13/94 at 73, 224–226).

## B. Plaintiff's Tenure with the State Police.

Plaintiff's first six months with the police were spent at the Connecticut Police Academy, as is the standard practice, where plaintiff was given extensive training in police procedures. (R. 1/18/94 at 24).

In December 1985, plaintiff successfully completed his training course at the academy and was assigned to "Troop G" of the State Police, which is located in Westport, CT. There he began his six-month "working test period" (WTP) as a Trooper Trainee. (*See* R. 1/12/94 at 100–102; R. 1/18/94 at 25).[3] The first ten weeks of plaintiff's placement in the Westport Troop were spent in the "Field Training Officer" program (FTO), during which plaintiff was accompanied by an experienced officer as he conducted his routine assignments. (R. 1/13/94 at 154–155, 210–211; R. 1/18/94 at 24–25). Plaintiff successfully completed this stage in his training. (R. 1/13/94 at 210–211; R. 1/25/94 at 276; Defs.' Post–Trial Brf. at 2). Plaintiff's problems arose after concluding the FTO stage in his training but still during his probationary period.

Plaintiff produced as his Exhibit 1, a brief, written history of his tenure with the Connecticut State Police, written by Lieutenant Cornelius Kerwin, who, at the relevant times, was Trooper Commander at Barracks G where plaintiff was stationed. *See* Pl.'s Ex. 1 (hereinafter "Kerwin Report"). As Kerwin admitted, this report was a "paper trail", prepared by him at the request of his superiors after he recommended to them plaintiff's

1. The aforementioned consent decree defined "minorities" as "Blacks and Hispanics" and the term "Hispanics" was defined as "persons of Mexican, Puerto Rican, Cuban, Central or South American or other non-European Spanish origin or culture, regardless of race." (Pl.'s Exh. 21 (*Men and Women for Justice*, Consent Decree, dated February 10, 1984, at 3).

2. Plaintiff's Exhibit 11 consists of plaintiff's interrogatories 8 and 9 and a letter from the State Attorney General's office in response thereto. This letter provides statistics for the years 1985, 1986, and 1987 regarding the numbers of white, black, and other minority troopers on the force, and the numbers of those disciplined in each of these categories.

3. Although there was some disagreement between the parties, it appears that each trooper trainee must complete a six month probationary period during which he or she is not covered by the collective bargaining agreement between the State and the troopers' union. Defendants' witness Col. John Watson—who held the rank of Major in the Connecticut State Police during plaintiff's tenure and was the commanding officer of the Western District, the district that included plaintiff's troop (R. 1/18/94 at 18)—explained that in his experience, trooper trainees during the working test period do not have the protection of the collective bargaining agreement and can be terminated for just cause, whereas a trooper who has finished the probationary period comes under the collective bargaining agreement. (R. 1/18/94 at 86–87.) A review of the Collective Bargaining Agreement between the State Police and the Police Union from the relevant time period shows that a trainee who had not finished the working test period could not appeal a decision to terminate him or her to a special appeal panel established through the collective bargaining agreement. (*See* Plf.'s Ex. 21, at 30–31 (bargaining agreement effective July 1, 1984 through June 30, 1987).

termination. (R. 1/18/94 at 48; 1/24/94 at 82–83; Pl.'s Ex. 12 at 201). Although plaintiff's reviews during the FTO period, which lasted into March 1986, were generally very strong, as defendants admit, the Kerwin Report documents several incidents that occurred during this time frame. As will become apparent, the Kerwin Report is a critical document for both sides in this case: for defendants, it purportedly provides a litany of plaintiff's objectionable conduct; for plaintiff, it merely shows that defendants cobbled together a host of minor and irrelevant incidents and disregarded favorable reviews and recommendations in order to justify the ultimate employment action taken. The Kerwin Report describes many of the incidents set forth below.

The first incident documented in the Kerwin Report arose out of a complaint filed in January 1986 (i.e., during the course of the FTO period) which alleged that *prior* to plaintiff becoming a member of the State Police he had provided a character reference for a friend of his who was a defendant in a pending criminal matter. (R. 1/12/94 at 59–73; 1/13/94 at 52–53). Plaintiff was reprimanded, told he should have used better judgment and was informed that no disciplinary action could be taken against him because the incident preceded his employment with defendants. (R. 1/12/94 at 59–73).

Another event documented in the Kerwin Report that occurred during the FTO period, on February 3, 1986, was an incident involving plaintiff when he was off-duty and driving with his sister in the car issued to him for use while off-duty. Plaintiff observed another automobile speeding on the highway and, believing the car to be a danger to other drivers, drove one-and-a-half miles at speeds of up to 95 miles-per-hour in order to catch up to the speeding car and clock its speed. Plaintiff employed the car's police light and siren in an unsuccessful attempt to stop the car. After plaintiff broke off the chase, the car exited the highway at an excessive speed, went through a guardrail, and skidded down an embankment. Plaintiff then attempted to provide aid to the crashed car's occupants. Plaintiff was reprimanded by Major Watson for having his sister in his car while engaging in this high-speed pursuit. (R. 1/12/94 at 84–95; 1/13/94 at 113–18).

Beginning in May, 1986, plaintiff received several "observation reports" from his superiors that indicated that plaintiff's performance was deficient in the areas of investigative techniques, report writing and compliance with department policies and procedures. (Pl.'s Ex. 1; Defs.' Post–Trial Brf. at 2). In addition, in May of 1986, Kerwin cited plaintiff for being the third lowest man in his troop that month because he had only 3.88 "per hour contact". In June of 1986, plaintiff was cited as third lowest man with 5.14 per hour contact.[4] (Pl.Ex. 1).

Additionally, in early May 1986, plaintiff made an ethnic slur directed at an Italian–American colleague and was orally reprimanded by Lt. Kerwin. (R. 1/12/94 at 95–99). Plaintiff stated that while he had observed other troopers making similar remarks in the barracks, he was unaware of any disciplining of these troopers for such actions. (R. 1/12/94 at 95–96).

On June 18, 1986, purportedly as a result of the deficiencies defendants saw in plaintiff's performance, particularly his report writing, plaintiff's WTP was extended through mid-October 1986. (Pl.'s Exh. 1). Plaintiff stated that he knew of no other trooper trainees at the time whose working test periods were extended. (R. 1/12/94 at 101).

Several days later, on June 21, 1996, plaintiff stopped a group of teenagers driving a van and seized a cooler full of beer from then. Plaintiff placed this cooler into his state police vehicle to secure it until he returned to his barracks. He was then ordered to remain on duty to cover the next shift because of an apparent shortfall of staff.

---

4. Plaintiff testified that these grades related to the number of motor vehicle arrests he made, but he was unsure how the listed numbers were calculated. Furthermore, he stated that he was told at the training academy that there was no quota for vehicle stops and that his Field Training Officer told him only that he should try to make three such stops per shift in order to keep his Troop Commander "off his back." (R. 1/12/94 at 48–56).

When he was later allowed to leave after only one extra hour of work, plaintiff left with the cooler still in his car.

On his way home from work that day, plaintiff caused a head-on collision between his car and another vehicle, allegedly because he was fatigued. Plaintiff was hospitalized for three days as a result of the accident. At the time of the accident, the cooler of beer was still in plaintiff's car. (R. 1/12/94 at 108–113; 1/13/94 at 120–122).

Due to the injuries plaintiff sustained in the accident, he received a three week leave-of-absence. During this period, on July 2, 1986, one of plaintiff's supervisors observed plaintiff operating his car with flashing lights, purportedly in an unsafe manner. (R. 1/12/94 at 115–122; 1/13/94 at 139–141). Plaintiff was allegedly responding to a call as a member of the Newtown Volunteer Ambulance Corps. (R. 1/12/94 at 119; Defs.' Post-Trial Brf. at 3).

In early August, 1986, plaintiff received another performance evaluation which noted that plaintiff's performance was unsatisfactory in several areas and that his overall rating was unsatisfactory. (Defs.' Exh. U).

In late August, 1986, plaintiff was orally reprimanded by Lt. Kerwin for misplacing his misdemeanor and infraction book. According to plaintiff, on the date in question, he issued a ticket to a vehicle operating outside of Troop G's jurisdiction and within that of Troop A. Therefore, he proceeded to Troop A's headquarters to file the ticket there in accordance with police procedures. He then made a photocopy of the ticket to take back to Troop G and left his ticket book near the copy machine. Plaintiff states that he was aware from a notice posted at Troop G that there had been previous incidents with another Trooper failing to account for tickets. (R. 1/13/94 at 58–62). Plaintiff failed to notify his supervisors of the loss of the book and acknowledged that he had no excuse for failing to do so. (R. 1/13/94 at 131–132).

In early October, 1986, plaintiff was sent to the training academy for a one day remedial course in report writing. (R. 1/13/94 at 147–148, 153–154).

On October 8, 1986, Lt. Kerwin recommended to Maj. Watson plaintiff's termination, but Watson purportedly instructed Kerwin to allow plaintiff a few more weeks to see if the remedial training regarding report writing would have any effect. (R. 1/18 at 127–129). On October 21, 1986, plaintiff purportedly failed to follow departmental procedures for the handling of urine samples from a person arrested for driving while intoxicated. (R. 1/19/94 at 51–55; Defs.' Ex. R).

Plaintiff's October 1986 performance evaluation, like the ones he had received previously, rated him unsatisfactory overall. (R. 1/13/94 at 141–146; Defs.' Ex. V). In late October, 1986, plaintiff's WTP was extended again to run until January 1987. (R. 1/13/94 at 212). By memorandum dated October 30, 1986, Kerwin recommended plaintiff's termination and Watson concurred. (Defs.' Ex. EE). Watson believed that although plaintiff had the capacity to do the work of a State Trooper, he did not want to put forth the effort. (R. 1/24/94 at 223).

Plaintiff received a memorandum directing him to report to State Police Headquarters in Hartford on December 16, 1986 to speak with Lieutenant Colonel Mulligan concerning Plaintiff's status with the State Police. The meeting was attended by plaintiff, Lt. Col. Mulligan, Sgt. Maslan (one of plaintiff's immediate supervisors) and two troopers. At the end of this meeting, plaintiff was permitted to resign in lieu of being terminated. (R. 1/13/94 at 55–58; 1/13/94 at 135–138).[5] During the training period for plaintiff's class, five of nine black trooper trainees from plaintiff's class were terminated or resigned, two of seven hispanic trooper trainees similarly did not complete their probationary period and one of "about 45 to 50" white trooper trainees from the class were not elevated to full trooper status. *See* Report of Special Master, Professor Emeritus Burke Marshall

---

5. Counsel for defendants admitted that plaintiff's resignation was, in fact, a constructive discharge.

(R. 1/24/94 at 46).

(hereinafter "Marshall Report") at 2.[6]

Mulligan stated that he made the decision to fire plaintiff based on a review of the following: the documentation presented to him by the Labor Relations Office, which was a booklet concerning plaintiff's records; his discussions with plaintiff's supervisors; and his perceptions of plaintiff during the December 16, 1986 meeting. (R. 1/25/94 at 205–207). Mulligan testified that he was certain that he had discussions with then-Maj. Watson because they would converse regularly concerning the progress of the trainees. (R. 1/25/94 at 207–208).

Mulligan determined, on the following bases, that plaintiff should be terminated, or, as he put it, why his appointment as full trooper was "not merited": [7]

> I was mostly concerned about his inability to record in writing the events that took place during an investigation. The life-blood of our department is to be able to report the activities that we undertake. As a matter of fact, without doing so, forms like these cannot take place. So it was very important to me that he be able to do that and express himself in writing correctly. And he hadn't shown me that he could. The talks that I had with trooper trainee Evans didn't seem to give me the hope that he would be able to overcome them with any other remedies because his attitude of indifference didn't indicate to me that he wanted to put an effort forth to correct them, even though we had gone the extra mile to try to get him extra training and extra supervision, changing, I believe [Field Training Officers] for him so that there was no personality conflict, alternating sergeants so that

he'd have a different view from supervisors, and he just didn't seem to respond to any of that.

(R. 1/25/94 at 211–212).

Mulligan stated that he told plaintiff that he considered plaintiff's report writing "intolerable", yet plaintiff "didn't seem to think it was a big thing." (R. 1/25/94 at 214).

Mulligan continued: "The main problem (sic), as I previously stated, was the inability to communicate written reports accurately and the fact that he appeared to not give me the opportunity to think that he was going to change any of that in the future, and this DWI problem, to me was just one more factor in the situation." (R. 1/25/94 at 221–222).[8] Mulligan said that there were no other problems (R. 1/25/94 at 222) and that there was the "accident" (assumably where Evans was hurt) but that "would not have been something that would have concerned me, even though I am sure that it was caused by has fault being asleep at the wheel, but, I mean, it's not something I would have terminated him for." (R. 1/25/94 at 222–223).

Mulligan testified that he told plaintiff the basis for his belief that plaintiff should be terminated and then gave plaintiff an opportunity to respond, and, given plaintiff's response, "I didn't feel as though he met the standards or could meet the standard." (R. 1/25/94 at 223–224). Mulligan testified that plaintiff's response to these statements was that he had had problems in the past but that he had overcome them. (R. 1/25/94 at 224). Apparently this response was not satisfactory. Plaintiff was terminated and then given

**6.** Professor Emeritus Marshall was originally informed that one of the black trooper trainees—Beverly Pace—was white. The numbers set forth in the text are different from those set forth in the Marshall Report to correct the error in the information originally given to Prof. Marshall concerning Ms. Pace's race. (*See* Defs.' Objections to Marshall Report at 2.)

**7.** Throughout the course of this opinion, the court considers that plaintiff was terminated, although, in reality, he was simply not promoted to full trooper. He was not, however, given a

chance to remain on as a trooper trainee once this determination was made and was effectively discharged because he was given a chance to resign after he was told he was going to be fired.

**8.** It is unclear, when Mulligan refers to "this DWI problem", whether he was referring to plaintiff's purportedly improper handling of the urine samples as described above, or if he was insinuating that plaintiff was driving while under the influence of alcohol either when he engaged in the high speed pursuit while off-duty or when he purportedly fell asleep at the wheel and crashed his car.

an opportunity to resign. (R. 1/25/94 at 224–225).

Mulligan *did* discuss the positive elements of plaintiff's work: that plaintiff was a "good activity producer", who got along well with others (colleagues and the public) and who represented himself "well on the assignment." (R. 1/25/94 at 270–271).

When asked about the steps the police department was taking to remedy the hiring and retention disparities between whites and people of color made evident by the *Men and Women for Justice* case described above, Mulligan stated that in order to fulfill the goals of the consent decrees entered in that case—i.e., a staff consisting of ten percent people of color and women—the department "reached out to various large cities throughout the country, through the armed forces, through other agencies to advertise the attractiveness of our program, and tested in all parts of the country to make it convenient for possible applicants to get positions within our training classes." (R. 1/25/94 at 192).

Given the goal of complying with the consent decree in this prior case, Mulligan testified that he spoke to police academy staff concerning the fact that a disproportionate number of minorities did not complete their probationary period because of deficiencies in report writing. (R. 1/25/94 at 274). When asked why a disproportionate number of minorities did not complete the training period Mulligan gave the following answer:

> The only thing that that can be attributed to is that we, under the tremendous desire to get people into our program, we'd embraced a multitude of people and brought them into our program. And we might not have had the desire in some people that would have been in others to stay there and work hard to maintain the

standards and remain there. That's the only thing I can think of.

(R. 1/25/94 at 279).

### C. Problems Evident in Defendants' Presentation of its Purported Reasons for Terminating Plaintiff.

Because of the lengthy record at this time and the sometimes contradictory testimony of defendants' witnesses, it is important to review defendants' submissions regarding the purported bases for terminating plaintiff's employment.

Defendants' have proffered the following reasons for plaintiff's termination: 1) poor performance and productivity; 2) plaintiff's ambition, as evidenced by the statement to the Newtown newspaper;[9] 3) plaintiff's provision of a character reference to a friend in a pending criminal matter; 4) the car chase while plaintiff was off-duty; 5) the ethnic slur; 6) when plaintiff fell asleep at the wheel and mishandled evidence; 7) when plaintiff responded to an emergency call while on sick leave; 8) when plaintiff failed to properly conduct a urine analysis test of a person suspected of driving while intoxicated; 9) temporary loss of plaintiff's misdemeanor and infractions book; 10) inadequate report writing.

Defendants have come forward with different reasons at different times. At times defendants have argued that certain things justified defendants' actions and at other times distancing themselves from such statements.[10] Indeed, defendants' own witnesses contradicted the items listed in the Kerwin Report and set out by defendants' counsel in defendants' Post–Trial Brief (*Id.* at 9–12), discounting the import of many of the items proffered by defendants. Up the chain of command, defendants' own witnesses admitted that the bases found in the Kerwin Report and elsewhere were either expressly

---

9. On July 12, 1985, plaintiff, while still employed by the Newtown Police, told a reporter for the *Newtown Bee* newspaper that he was joining the State Police with the hope of becoming the Commissioner one day. (R. 1/12/94 at 47, 57–59).

10. For example, although both defendants' counsel and Watson stated that the incident involving the reference plaintiff gave in a pending criminal

matter was not offered by defendants as a reason for their termination of plaintiff, (R. 1/18/94 at 65–69; R. 1/24/94 at 54–55), this incident was included in the Kerwin Report as an item justifying plaintiff's termination and Maslan stated that this incident was the main reason why he considered plaintiff as having poor judgment. (R. 1/19/94 at 70).

disregarded or implicitly ignored in the decision to terminate plaintiff.

The item concerning plaintiff's poor performance and productivity is a perfect example of the layers of contradiction apparent in defendants' case. Lt. Col. Mulligan expressly stated that plaintiff was a "good activity producer" and never mentioned "poor productivity" as a basis for his decision to terminate plaintiff. (R. 1/25/94 at 270). Additionally, Watson admitted that although plaintiff was cited in the Kerwin Report as being third lowest in his troop in productivity for two months during his probationary period, the Report did not state that plaintiff had a purportedly poor ranking during any other month and this indicated that during those months his productivity was acceptable.[11]

Similarly, Watson expressly rejected as bases for termination plaintiff's statement to the Newtown Bee newspaper [12] and the fact that plaintiff had given a character reference to a friend in a pending criminal matter because both of these incidents occurred prior to plaintiff's tenure with the State Police. (R. 1/18/94 at 48–53, 65; R. 1/24/94 at 54–55, 139–40, 203).[13] Moreover, by expressly disregarding any factors other than plaintiff's purportedly poor report writing and poor attitude, Mulligan revealed that many of these items were not bases for termination, nor were they seriously considered by him as reasons for termination in this instance: e.g., the incident involving the misdemeanor and infractions book, the car chase while plaintiff was off-duty, the ethnic slur, the incident where plaintiff fell asleep at the wheel,[14] and

the incident where plaintiff responded to an emergency call while on sick leave. (R. 1/25/94 at 221–223).[15] Accordingly, all that the court is left to consider as the reasons defendants relied upon for the termination are plaintiff's purportedly deficient report writing skills and his bad attitude.

Yet doubts even exist as to the report writing arm of defendants' arguments. First, although Watson stated that he determined that plaintiff should receive remedial instruction in report writing before Watson would recommend his termination, several weeks after that remedial training Watson did not review any of the reports plaintiff produced after the training, leaving the court to question whether the remedial gesture was disingenuous. (R. 1/24/94 at 73, 134–138, 235). Second, defendants failed to produce any evidence that plaintiff's report writing was poorer than plaintiff's white colleagues from his academy class who were retained but simply relied on the subjective findings of plaintiff's superiors who admitted that they had no objective standard to apply to report writing. (R. 1/24/94 at 60–61, 202; R. 1/25/94 at 152–153). Indeed, the record is completely devoid of any probative evidence that plaintiff's report writing was any worse than any other trooper trainee. Although defendants were able to produce some of the purportedly faulty records maintained by plaintiff, they failed to produce reports that could show that plaintiff's report writing was not on par with that of other troopers who were retained.

---

11. Furthermore, Watson indicated that there was no set standard for acceptable or unacceptable levels of productivity. Rather, each individual trooper's productivity is generally measured against the average for a particular troop in a given month. Therefore, unless one knows the average level of productivity for a given month in a given troop, the ranking "third lowest" is meaningless. (R. 1/24/94 at 131–132).

12. In fact, Watson completely dismissed the relevancy of this incident. (R. 1/18/94 at 53 ("That particular portion [of the Kerwin Report] that regards his statement to the Newtown [Bee], I didn't find it necessary to discuss that any further with [plaintiff]. It was nonsense to me, and I just disregarded it.")).

13. It is interesting to note that despite Watson's rejection of the character reference as a sign of

plaintiff's poor judgment, Sgt. Maslan, one of plaintiff's immediate supervisors, stated that he believed that this item was the main reason for his evaluation of plaintiff as having "poor judgment". (R. 1/19/94 at 70; Plf.'s Exh. 9, Item 22 (Evaluation Report)).

14. Similarly, Watson, when pressed, was unable to say whether or not white officers involved in car accidents received reprimands for such conduct as did plaintiff. (R. 1/24/94 at 199–201).

15. Indeed, Mulligan expressly noted that the incident involving the accident where plaintiff appears to have fallen asleep at the wheel, was "not something [he] would have terminated [plaintiff] for." (R. 1/25/94 at 222–223).

Lastly, then, the court is left with plaintiff's purported "attitude" problem. Putting aside the bias evident in the testimony quoted above from Mulligan, that plaintiff had an attitude problem is contradicted, once again, by defendants' own witnesses. At one point, Watson praised plaintiff as a "gentlemen." (R. 1/18/94 at 78). Similarly, Mulligan even stated that during the meeting in which plaintiff was asked to resign plaintiff was "extremely polite, a perfect gentleman." (R. 1/25/94 at 261). Similarly, the record is also replete with positive commendations concerning plaintiff's professionalism and bearing. (*See e.g.* Plf.'s Exhs. 22, 23, 36).

### D. Analysis of Subsequent Evidentiary Material By Special Master Burke Marshall.

Because of the complexity of the evidentiary problems, the court appointed Professor Emeritus Burke Marshall of the Yale Law School as a Special Master in this proceeding to review what personnel files were available from defendants' records on the white officers and the officers of color, both those retained and those terminated, during plaintiff's tenure.

Marshall reviewed the following documents: 1) personnel reports related to plaintiff; 2) reports related to trooper trainees in plaintiff's class at the police academy; 3) files on members of plaintiff's class who were terminated or resigned; 4) Field Training reports from 44 members of plaintiff's trooper class during their probationary period; 5) files related to a trooper from plaintiff's academy class who resigned in 1988; and 6) additional files related to plaintiff. (Marshall Report at 1).

Marshall reviewed statistics concerning a high rate of termination or resignation in the minority applicant pool for plaintiff's academy class: "[H]alf of the African–Americans were not retained, about thirty percent of the Hispanics, but fewer than ten percent of the white. In my opinion, however, these statistics do not of themselves show racial discrimination as a cause of the forced resignation of plaintiff. To do so they would have to be supplemented by statistical evidence over a larger period of time, and with larger numbers, as well as some proof of causation." (Marshall Report at 2).[16]

The review of those work product files of members of plaintiff's academy class that defendants did produce did reveal some strong disparities, however. Marshall found as follows: "The documents show unexplained treatment of plaintiff during his early probationary period, in the sense that several of his peers with strikingly inferior early records successfully ended as members of the Department while he did not." (Marshall Report at 2). Marshall makes this observation "because of the successful conclusion of the probationary program by some members of the [class] whose FTO reports indicated serious problems, as compared with those of plaintiff, which indicated none." (Marshall Report at 3).

Marshall also reviewed the defendants' reports regarding plaintiff's purportedly deficient report writing but was unable to "form an opinion as to whether plaintiff was treated differently from his peers as to the detail and depth of the criticism of his incident reporting." The other troopers who were dismissed or forced to resign were cited for reasons other than report writing, Marshall states, and thus this information is inconclusive as it relates to plaintiff. Moreover, Marshall adds:

> [T]here is no documentary evidence available to me of the quality of report writing by those kept on the force. There is also no comparative evidence of the degree of scrutiny given by Sgt. Maslan to other probationary officers. The files examined accordingly do not disclose whether or not plaintiff was judged in this respect by a standard different (and more stringent) than that applied to his peers, or if so, why.

(Marshall Report at 4).

### II. CONCLUSIONS OF LAW

As set forth below, the court has reviewed the instant case under both the traditional

16. As noted previously, *supra* n. 5, Marshall's information regarding the race of one of the members of the academy class who left the force was incorrect so that, in reality, one more black trainee left the force than originally tallied by Marshall: i.e. five of nine trainees were not retained rather than four of eight.

three-step analysis set forth by the court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), as well as the "mixed motive" analysis set forth in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). *See Starceski v. Westinghouse Elec. Corp.,* 54 F.3d 1089, 1098 (3d Cir.1995) (citation omitted) (holding employee may present case under both *McDonnell Douglas* and *Price Waterhouse,* and the trial court must determine whether " 'one or both' " of the theories apply to the given case).

## A. Discriminatory Treatment Under *McDonnell Douglas.*

### 1. The Law to Apply.

Title VII of the Civil Rights Act of 1964 makes it unlawful "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race ..." 42 U.S.C. § 2000e–2(a)(1). Based upon the evidence adduced at trial, the court considers plaintiff's allegations under the familiar three-step burden shifting analysis set forth by the Supreme Court in *McDonnell Douglas, supra,* and *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253–54, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981), and further described in *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 505–512, 113 S.Ct. 2742, 2746–2750, 125 L.Ed.2d 407 (1993).

In *McDonnell Douglas,* the Court established "an allocation of the burden of production and an order for the presentation of proof in Title VII discriminatory-treatment cases." *Hicks,* 509 U.S. at 506, 113 S.Ct. at 2746 (footnote omitted). Under the standards set forth in *McDonnell Douglas,* plaintiff must first prove by a preponderance of the evidence a *"prima facie "* case of racial discrimination by proving: 1) that he is a member of a protected class (i.e., that he is black); 2) that he was qualified for the position to which he applied; ·3) that he was rejected or terminated in circumstances giv-

ing rise to an inference of discrimination. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824. The *prima facie* burden serves an "important function" in Title VII litigation, *Burdine,* 450 U.S. at 253–54, 101 S.Ct. at 1093–94, because it "raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949–2950, 57 L.Ed.2d 957 (1978).

■ Once plaintiff has established his *prima facie* case of discrimination based on race, "the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.' " *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093 (quoting *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824). *See also Hicks,* 509 U.S. at 506–507, 113 S.Ct. at 2746–2747. At this stage, the defendant " 'must clearly set forth, through the introduction of admissible evidence,' reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *Hicks,* 509 U.S. at 507, 113 S.Ct. at 2747 (quoting *Burdine,* 450 U.S. at 254–255 and n. 8, 101 S.Ct. at 1094 and n. 8). *See also Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 203 (2d Cir.1995) (same).

■ Once defendant carries this burden of production, plaintiff must show that the reasons articulated for the adverse decision were pretextual and that plaintiff was the victim of discrimination. *Hicks,* 509 U.S. at 507, 113 S.Ct. at 2747. As reiterated by the Court in *Hicks,* " '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.' " *Id.* (quoting *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093–94) (alteration in original). It is important to note, and as Second Circuit case law makes clear, similar to a case involving so-called "mixed motive" analysis,[17] "the plaintiff is not required to show that the

---

17. *See Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) and

discussion at § II., B., *infra.*

employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d at 203. *See also, Hagelthorn v. Kennecott Corp.*, 710 F.2d 76, 82 (2d Cir.1983) (holding plaintiff must only show that discriminatory motive "made a difference" in the decision to take the adverse employment action). Thus, plaintiff is ultimately required "to prove only that, even if performance and attitude were factors in his termination, nevertheless he would not have been fired but for his [race]." *Hagelthorn v. Kennecott Corp.*, 710 F.2d at 86.

■ Plaintiff's burden at this stage can be met by presenting "additional evidence showing that 'the employer's proffered explanation is unworthy of credence,'" *Cronin*, 46 F.3d at 203 (quoting *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095), or "by reliance on the evidence comprising the prima facie case, without more." *Cronin*, 46 F.3d at 203 (citing *Hicks*, 509 U.S. at 511, 113 S.Ct. at 2749). *See also Gallo v. Prudential Residential Services*, 22 F.3d 1219, 1224 (2d Cir.1994). The *Hicks* case and Second Circuit case law make clear that disbelief of defendant's articulated reason for the adverse employment action is sufficient to support, although it would not necessarily compel, a finding for plaintiff. *Hicks*, 509 U.S. at 511, 113 S.Ct. at 2749; *Cabrera v. Jakabovitz*, 24 F.3d 372, 385 (2d Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 205, 130 L.Ed.2d 135 (1994). *See also, Binder v. Long Island Lighting Co.*, 57 F.3d 193, 200 (2d Cir.1995) (holding trier of fact may "generally infer discrimination when it finds that the employer's explanation is unworthy of credence."); *E.E.O.C. v. Ethan Allen, Inc.*, 44 F.3d 116, 120 (2d Cir.1994) (holding that a "finding of pretextuality allows a juror to reject a defendant's proffered reasons for a challenged employment action and thus permits the ultimate inference of discrimination."); *Saulpaugh v. Monroe Community Hosp.*, 4 F.3d 134, 142 (2d Cir.1993) (holding plaintiff's ultimate burden of proof can be met by "combining" proof submitted in its *prima facie* case with "evidence that defendant's proffered reasons for its acts were

false."), *cert. denied*, 510 U.S. 1164, 114 S.Ct. 1189, 127 L.Ed.2d 539 (1994); *DeMarco v. Holy Cross High Sch.*, 4 F.3d 166, 170 (2d Cir.1993) (holding defendant's proffer of a false reason for employment action sufficient basis for trier of fact to find that such action was "motivated by an improper discriminatory intent.").

### 2. Plaintiff's *Prima Facie* Case.

Here, plaintiff established a *prima facie* case of discrimination based on race. Prior to setting forth the court's findings on this issue, it is important to note that the evidence reviewed in consideration of plaintiff's *prima facie* case must always be judged in the light of the difficulty of establishing direct evidence of discrimination because "[e]mployers are rarely so cooperative as to include a notation in the personnel file'" that their actions are discriminatory in nature. *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 464 (2d Cir.1989) (quoting *Thornbrough v. Columbus & Greenville Railroad Co.*, 760 F.2d 633, 638 (5th Cir.1985)) (alteration in original). Indeed, "direct evidence of discrimination is difficult to find precisely because its practitioners deliberately try to hide it. Employers of a mind to act contrary to law seldom note such a motive in their employee's personnel dossier." *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1112 (2d Cir.1988). An employer engaged in invidious employment practices "is unlikely to leave a 'smoking gun' attesting to a discriminatory intent, a victim of discrimination is seldom able to prove his claim by direct evidence, and is usually constrained to rely on circumstantial evidence." *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir.1994).

#### a. Standing.

Plaintiff is a black male and thus is within the class of individuals protected under Title VII. *See, e.g., McDonnell Douglas* 411 U.S. at 802, 93 S.Ct. at 1824.

#### b. Plaintiff's qualifications.

■ Plaintiff met the second prong of the *McDonnell Douglas* test by showing that he

was qualified for the job as state trooper. The plaintiff submitted the following evidence supporting plaintiff's qualifications: 1) he had a college degree, (R. 1/12/94 at 25–26); 2) he served as a member of the Newtown Police for almost five years, (R. 1/12/94 at 26–27); 3) he was preliminarily screened during the application to the State Police and accepted into the force, (R. 1/12/94 at 28–29) [18]; 4) he graduated from the police academy; 5) during his service in the academy and during the FTO period he exhibited skills superior to trooper trainees who were ultimately retained (Marshall Report at 2); and 6) he served for several months as a trooper trainee without incident, (Defs.' Exh. U at 5; Defs.' Post–Trial Brf at 2). This showing exceeds the "de minimis" standard considered applicable at the *prima facie* stage of a case. *Chambers v. TRM Copy Centers Corp.*, 43 F.3d at 37.

■ Furthermore, although he insisted that plaintiff refused to put forth the effort to perform satisfactorily, Watson admitted that plaintiff was qualified for the job. (R. 1/24/94 at 220 ("I thought [plaintiff] made a good candidate. He did have the qualifications, and it appeared he had everything else, the ability to do the job.") and at 223 ("I thought he had the capacity to perform as a Connecticut State Police officer. He didn't appear to me to be putting the effort forward, however, that was necessary to do that.")). Similarly, counsel for defendants admitted that plaintiff certainly had the minimal qualifications for acceptance into the police academy and the trooper trainee program.[19] (R. 1/13/94 at 210). A plaintiff need not "demonstrate that his performance was flawless or superior . . .", but rather that he " 'possesses the basic skills necessary for performance of [the] job,' " *de la Cruz v. New York City Human Resources Admin.*, 82 F.3d 16, 20 (2d Cir.1996) (quoting *Powell v. Syracuse Univ.*, 580 F.2d 1150, 1155 (2d Cir.)

*cert. denied,* 439 U.S. 984, 99 S.Ct. 576, 58 L.Ed.2d 656 (1978) (alteration in original). Although plaintiff's allegedly poor report writing and bad attitude may ultimately serve as defendants' alleged reasons for terminating him, Second Circuit case law makes clear that plaintiff's actual performance on the job "is distinct . . . from the issue of minimal qualification to perform a job." *Owens v. New York City Housing Authority*, 934 F.2d 405, 409 (2d Cir.), *cert. denied,* 502 U.S. 964, 112 S.Ct. 431, 116 L.Ed.2d 451 (1991). *See also, Mulqueen v. Daka, Inc.*, 909 F.Supp. 86, 88–94 (N.D.N.Y.1995) (same). Moreover, to force plaintiff to show, at the *prima facie* stage in the litigation, that defendants' arguments concerning his report writing and attitude are meritless would "unnecessarily collapse[ ] the steps suggested in *McDonnell Douglas* by shifting considerations which are more appropriate to the employer's rebuttal phase." *Powell v. Syracuse Univ., supra.*, 580 F.2d at 1155. Accordingly, plaintiff has met this element of the *McDonnell Douglas* analysis. *de la Cruz*, 82 F.3d at 20; *Owens*, 934 F.2d at 409.

#### c. Inference of Discrimination.

■ Plaintiff was terminated—or, put another way, not promoted to full trooper status—in circumstances giving rise to an inference that race was a significant factor in this decision. The following facts, taken as a whole, raise this inference: 1) that the State Police had exhibited a history of failing to hire and retain people of color as troopers; 2) that five of the nine black troopers in plaintiff's class did not complete their probationary period, while all but one of the 45–50 white troopers in the class were elevated to full trooper status (Marshall Report at 2); 3) that defendants offered no evidence to justify the clear evidence offered by plaintiff that showed that minority troopers were far more

---

18. *See Gallo v. Prudential Residential Services, supra*, 22 F.3d at 1225 (holding employee's experience at a prior job which required skills necessary to serve in position from which plaintiff was fired sufficient to establish her qualifications under *McDonnell Douglas* test).

19. Although admitting that plaintiff, who had a college degree and had served for several years in a local police force, met the minimal qualifications for admission into the police academy, which required only that the applicant have a *high school* degree and be of at least eighteen years of age, (R. 1/13/94 at 210), defendants never set forth any objective standard by which a trooper trainee is measured to qualify him or her for promotion to full trooper.

likely than whites to be disciplined; 4) that, early in the probationary period, plaintiff exhibited skills superior to many of the trooper trainees who were ultimately retained, (Marshall Report at 2); 5) that defendants appeared to overlook when white troopers engaged in conduct similar to that which allegedly justified plaintiff's termination.[20] *See, e.g., Chambers v. TRM Copy Centers Corp.*, 43 F.3d at 37–38 (holding "[c]ircumstances contributing to a permissible inference of discriminatory intent may include [*inter alia* ] . . . more favorable treatment of employees not in the protected group . . .") (citation omitted).

### 3. Defendants' Reasons as Pretext for Discrimination.

■ Although defendants met their burden of articulating a reason, or reasons, for terminating plaintiff, the record makes clear that (1) defendants did not actually rely on most of the reasons proffered by counsel and that (2) those few reasons upon which defendants' agents alleged they actually relied were contradicted by the agent himself or other agents and in some instances were hardly free from discriminatory animus. For the reasons set forth below, the court finds that defendants' articulated reasons were merely pretextual.

### a. Discrepancies in Defendants' Reasons.

There were serious discrepancies between the reasons articulated by defendants' counsel and those stated by defendants' witnesses. There were also glaring contradictions between different individuals with input into the decision making process. At the direction of higher management (R. 1/18/94 at 48), the lower level supervisors concocted a biased, one-sided and secret personnel file—which was referred to as a "paper trail"—concerning plaintiff in order to justify their recommendations to terminate him. (R. 1/24/94 at 82–83; Pl.'s Ex. 12 at 201). In addition, although defendants' counsel offered as reasons for the termination nearly all of the reasons set forth by the lower level management as defendants' bases for terminating plaintiff,[21] the higher level management disregarded the majority[22] of these reasons when they made the decision to terminate plaintiff. Accordingly, based upon the discrepancies apparent in defendants' proffer of reasons for taking the adverse employment decision challenged herein, the court infers that the majority of the reasons proffered by defendants' counsel are merely pretextual. *E.E.O.C. v. Ethan Allen, Inc.*, 44 F.3d at 120 (holding that based upon discrepancies in defendant's articulated basis for discrimination, reasonable trier of fact could infer that these were pretextual and "developed over time to counter" evidence suggesting discrimination).

### b. Poor Report Writing.

■ The facts and circumstances surrounding purportedly poor report writing led the court to conclude that this basis is also

---

**20.** That plaintiff appeared to have been held to a higher standard than his collegues in general was a conclusion reached by the Special Master which the court accepts. (Marshall Report at 2). Moreover, that plaintiff was treated differently than white colleagues in particular seems apparent: e.g., the incident involving plaintiff's use of an ethnic slur, (R. 1/12/94 at 95–96); the accident that occurred due to plaintiff allegedly falling asleep at the wheel, (R. 1/24/94 at 199–201); plaintiff's misplacement of his misdemeanor book, (R. 1/13/94 at 58–62). Although higher level management ultimately dismissed each of these reasons that were supplied by plaintiff's immediate supervisors, this evidence of discriminatory scrutiny is sufficient to meet plaintiff's *prima facie* burden of showing that race was more likely than not a factor in the decision making process.

**21.** *See, e.g.,* Defs.' Post–Trial Brf. at 9–12.

**22.** For the reasons set forth above, § I., C., *supra.*, these are: plaintiff's purportedly poor productivity; plaintiff's statement to the Newtown Bee newspaper; that plaintiff had given a character reference to a friend in a pending criminal matter; plaintiff's loss of his misdemeanor and infractions book; the car chase while plaintiff was off-duty; the ethnic slur, the incident where plaintiff fell asleep at the wheel; the incident where plaintiff responded to an emergency call while on sick leave. By expressly disregarding any factors other than plaintiff's purportedly poor report writing and poor attitude, Mulligan revealed that these items were not bases for termination, nor were they seriously considered by him as reasons for termination in this instance. (R. 1/25/94 at 221–223).

pretextual. Under cross-examination, defendants' witnesses revealed that they failed to consider plaintiff's purportedly insufficient report writing against any objective standard, but rather merely viewed it subjectively, without the benefit of any benchmark by which to determine its sufficiency: e.g., what number of deficient reports would be considered unsatisfactory. (R. 1/24/94 at 60–61, 202; R. 1/25/94 at 152–153). Although an employer may rely upon supervisor evaluations to assess an employee's performance when carrying out an employment decision, *Meiri v. Dacon,* 759 F.2d 989, 995 (2d Cir.), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985), when plaintiff has raised serious questions concerning the probative value of these subjective criteria, as plaintiff has done here, or has challenged such criteria as the means by which defendants sought to discredit and devalue plaintiff's work, the court must examine these criteria closely for evidence of bias.

First, plaintiff effectively showed that higher level management did not seriously take into account whether plaintiff had improved in this area after the remedial training. (R. 1/24/94 at 134–138). Thus the court can easily infer that the attempt to improve plaintiff's writing skills—not unlike the development of a paper trail or the allegation that plaintiff was unproductive—was a ruse to cover up the real reason for the imminent termination. *E.E.O.C. v. Ethan Allen, Inc.,* 44 F.3d at 120.

Second, defendants, repeatedly (although requested by plaintiff's counsel and the court) chose not to produce meaningful comparative records that would support defendants' claim that they terminated plaintiff because of his deficient report writing: i.e., any information that would show that those troopers from plaintiff's class who were retained were better report writers than plaintiff. Although both the court and plaintiff repeatedly requested it, defendants simply failed to submit information by which the court could compare plaintiff's treatment with that of other troopers.[23] Defendants' failure to produce such critical information is another basis by which the court can disregard the "poor report writing" arm of defendants' case. *See, e.g., Chambers v. TRM Copy Centers Corp.* 43 F.3d at 39–40[24]; *Stewart v. International Business Machines Corp.,* 867 F.Supp. 238, 241 (S.D.N.Y.1994) (noting "[i]f information primarily available to the employer which would shed light on the case is not provided, an adverse inference may also be drawn.") (footnote omitted).

**c. Plaintiff's Attitude of Indifference.**

Defendants' witness Lt. Col. Mulligan stated, in effect, that plaintiff's "attitude of indifference" was also a reason for plaintiff's termination. The court is unable to overlook the fact that this evaluation is inextricably intertwined with the bias evident in Mulligan's testimony concerning the new recruits of color who Mulligan believed did not have the requisite "desire" to become troopers. The subjective assessment concerning plaintiff's attitude, made during a brief meeting at which the very palpable threat of plaintiff's

---

**23.** On repeated occasions the court directed defendants to provide the court and plaintiff with the comparative information relevant to defendants' defense in this case: i.e., information that would show that plaintiff's report writing was deficient when compared to plaintiff's white colleagues. (*See e.g.,* R. 1/18/94 at 102–105, 112; R. 1/24/94 at 144–45). Moreover, although directed to produce records that they admitted were supposed to be held for 55 years by the police force (R. 1/25/94 at 49–53), defendants failed to produce any such information.

At the close of the initial phase of the bench trial in this case, because of defendants' failure to comply with discovery requests and orders, plaintiff moved for judgment and attorney's fees under Fed.R.Civ.Proc. 37 for defendants' failure to produce the relevant records as required by the court. This request shall be taken up at the damages phase of this case, which had been bifurcated pending a finding on liability, which has now been reached.

**24.** In *Chambers, supra,* the court found as follows:

The factfinder could also conclude that [defendant's] placement of the entire onus for [plaintiff's] discharge on Perteet, an African-American (a) who could not be found to testify, and (b) from whom [defendant] apparently had not obtained a supporting statement even while he was employed by [defendant] in the 10 months after [plaintiff's] filing of his employment-discrimination complaint ... should be discredited.
43 F.3d at 39.

termination loomed large, was more likely than not a product of Mulligan's own predisposition rather than a lucid and unbiased evaluation. The court cannot simply ignore the undercurrent of bias that erodes Mulligan's credibility on this issue. Accordingly, defendants' final reason for purportedly terminating plaintiff—that he had an "attitude of indifference"—was, in effect, a euphemism for "plaintiff was black."

### 4. Conclusion Concerning Plaintiff's Case of Discrimination Under *McDonnell Douglas.*

In conclusion, based upon the record before the court and the demeanor of the witnesses present at trial, the court finds the following: 1) statistical evidence produced by plaintiff tended to show that minorities were far more likely than whites to be disciplined; 2) that the majority of blacks in plaintiff's trainee class did not complete the probationary period; 3) that the reasons proffered by defendants for taking the action challenged herein were in many respects insignificant to the actual decisionmakers and were the product of a search for reasons to justify the adverse employment decision; 4) that, because there were serious discrepancies in defendants' reasons for the decision, as well as serious deficiencies in defendants' proffer of evidence thereof, defendants' reasons are unworthy of credence; and, 5) that the decisionmaker ultimately responsible for the challenged employment action admitted that his decision to terminate plaintiff was basically subjective and revealed that he harbored serious subjective bias towards blacks and other minorities. Given these findings and based upon this record, the court concludes that it was more likely than not that race was a significant and motivating factor in the decision to take the adverse employment action complained of herein and thus defendants have violated Title VII.

### B. *Price Waterhouse* Discrimination.

### 1. The Law to Apply.

Even assuming that plaintiff had not established that all of defendants' reasons for deciding not to promote him to full trooper were not unworthy of credence, plaintiff could still prevail under a "mixed motive" theory of recovery as set forth by the Court in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989); *Ostrowski v. Atlantic Mutual Insurance Cos.,* 968 F.2d 171, 181 (2d Cir.1992).[25]

█  Under a mixed motive theory, a plaintiff "must initially show more than the 'not onerous' *McDonnell Douglas–Burdine* factors." *Tyler v. Bethlehem Steel Corp.,* 958 F.2d 1176, 1181 (2d Cir.), *cert. denied,* 506 U.S. 826, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992); *de la Cruz v. New York City Human Resources Admin.,* 82 F.3d 16, 22 (2d Cir.1996) (holding plaintiff's burden "greater than the level of proof necessary to make out a *McDonnell Douglas prima facie* case.") If the plaintiff can produce evidence establishing that an illegitimate factor played a motivating role in the challenged employment decision, the defendant must then prove that the defendant would have reached the same decision even in the absence of the impermissible factor. *Tyler,* 958 F.2d at 1181; *Lieberman v. Brady,* 926 F.Supp. 1197, 1202 (E.D.N.Y.1996); *White v. Arab Banking Corp.,* 93 Civ. 5335, 1996 WL 191727, at *13 n. 4 (S.D.N.Y. April 22, 1996); *Calabritto v. Nassau County District Attorney,* 920 F.Supp. 370, 376 (E.D.N.Y.1996).

The 1991 amendments to the Civil Rights Act expressly overruled the Court's ruling in *Price Waterhouse* by providing that a defendant that meets its burden of showing that it would have taken the challenged actions even in the absence of the discriminatory factor does not escape the entry of a declaratory judgment against it, nor would it escape the assessment of attorneys fees, but is relieved from having to pay compensatory damages or from having to reinstate the plaintiff. 42 U.S.C. § 2000e–5(g)(2)(B) (Supp. III 1991). *See, e.g.,* Kenneth R. Davis, *The Stumbling Three–Step, Burden–Shifting Approach in Employment Discrimination Cases,* 61

---

**25.** Defendants were clearly on notice that the court could consider the case under a mixed motive theory and prepared their arguments ac-cordingly. *See, e.g.,* Defs.' Post–Trial Brf. at 13–15.

Brooklyn L.Rev. 703, 750–751 (1995) (describing effect of 1991 amendments to the Civil Rights Act in relation to mixed motive analysis under Title VII).

Because the acts that give rise to the instant action occurred long before the 1991 amendments to Title VII, and because such amendments are not considered retroactive, *Landgraf v. USI Film Products,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), relief for the plaintiff can only be provided in the instant case under the standards set forth in *Price Waterhouse. O'Connor v. Viacom Inc./Viacom Int'l Inc.,* 93 Civ. 2399, 1996 WL 194299 (S.D.N.Y. April 23, 1996); *Lewis v. American Foreign Service Ass'n,* 846 F.Supp. 77, 81 (D.D.C.1993).

■■■ In order for a case to qualify as subject to a mixed motive analysis, plaintiff must produce "enough evidence that, if believed, could reasonably allow a jury to conclude that the adverse employment consequences were 'because of' an impermissible factor." *Tyler,* 958 F.2d at 1187. Plaintiff need not rely solely on direct evidence of the presence of discriminatory factors, however, but rather may rely on circumstantial evidence "tied directly to the alleged discriminatory animus." *Ostrowski v. Atlantic Mutual Insurance Co.,* 968 F.2d 171, 182 (2d Cir. 1992). Such evidence must be "of conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude, and that evidence [must be] sufficient to permit the factfinder to infer that the attitude was more likely than not a motivating factor in the employer's decision." *Id.* See also, *Hargett v. National Westminster Bank, USA,* 78 F.3d 836, 840 (2d Cir.1996) (quoting *Ostrowski); Fitzgerald v. Alleghany Corp.,* 904 F.Supp. 223, 229 (S.D.N.Y.1995) (same).

### 2. Plaintiff's Allegations.

■■■ As stated above, Lt. Col. Mulligan, the head of the police department who was ultimately responsible for the decision to terminate plaintiff, admitted that he considered black or latino recruits to the police department who had failed out during the training period as not possessing the requisite "desire" to succeed as state troopers. Similarly, although by Mulligan's own admission plaintiff stated to him that plaintiff had improved his report writing, Mulligan felt that plaintiff had an "attitude of indifference" about the report writing problems and that plaintiff did not think that the report writing was a "big thing". (R. 1/25/94 at 214; R. 1/25/94 at 211–212).

Here, Mulligan's statements reveal that he harbored views of blacks and latinos as lacking desire and that he considered plaintiff indifferent to the requirements of his job. Yet the subjective statement about the black and latino recruits under the police department's affirmative action program were wholly unsupported by any facts whatsoever. Similarly, the statements about plaintiff having an "attitude of indifference" would seem to be belied by the fact, as introduced through both Mulligan's own admissions and by plaintiff's allegations, that plaintiff asserted himself at the meeting in which he was terminated and stated that he believed his report writing had improved. (R. 1/25/94 at 224).

Mulligan's statements are sufficient to establish plaintiff's initial burden under a mixed motive theory of liability. Mulligan seemed to rely so heavily on his own subjective analysis of plaintiff and his attitude, (R. 1/25/94 at 211–212, 218, 222–224), it would be hard not to infer that his apparent bias was a significant factor in the adverse employment decision.

### 3. Defendants' Failure to Prove it Would Have Terminated Plaintiff Absent the Discriminatory Animus.

■■■ As stated above, in order to avoid Title VII liability, defendants then had the burden of showing that they would have terminated the plaintiff even in the absence of the discriminatory basis. For the reasons set forth below, the court finds that defendants have failed to meet this burden.

First, as set forth above, *Supra,* § I.C., the court cannot take into account those bases for termination proffered by defendants'

counsel that were ignored or contradicted by defendants' own witnesses.[26]

Second, with regard to Mulligan's statement that plaintiff had an "attitude of indifference", because such a subjective observation cannot be separated from the apparent discriminatory bias, the court cannot take this basis into account when considering defendants' purported reasons for terminating plaintiff.

Third, with regard to plaintiff's purportedly deficient report writing, defendants' have failed to sustain their burden of proving that they would have terminated plaintiff notwithstanding the discriminatory factor. There is simply no evidence in the record that would convince a trier of fact that plaintiff would have been terminated for his report writing. As set forth above,[27] defendants failed to produce any comparative records whatsoever to convince the court that plaintiff's reports were worse than other troopers who were retained. Without such evidence, defendants could not possibly sustain their burden of showing that they would have terminated plaintiff notwithstanding proof of discriminatory animus.

Defendants' burden in a mixed motive case—like plaintiff's burden under this analysis—is more stringent than that required under the *McDonnell Douglas—Burdine* calculus. Here, as set forth above, defendants have the burden of proving that they would have reached the same decision even though plaintiff has adduced evidence that race was a factor in defendants' decision to terminate him. *Tyler, supra,* 958 F.2d at 1181. Accordingly, without proffering more than the subjective conclusions of plaintiff's supervisors and without producing any comparative information whatsoever that would show that plaintiff's report writing was any worse than any of his colleagues, defendants have failed to show that they would have terminated plaintiff anyway.

## CONCLUSION

A review of the entire record shows that plaintiff was terminated under circumstances that show invidious discrimination was a motivating factor in the decision to terminate him.

Accordingly, the court finds that plaintiff has proven, by a fair preponderance of the credible evidence, that he was the victim of race discrimination in the terms and conditions of his employment when defendants terminated him in December 1986 in violation of Title VII of the Civil Rights Act of 1964.

**26.** *See, supra* n. 22.

**27.** *See supra* § II., A., 2.