**Harold F. EVANS, Jr., Plaintiff,**

v.

**STATE OF CONNECTICUT, State Police Division of Public Safety & Nicholas Cioffi, Defendants.**

**No. CV B–90–027(CBM).**

United States District Court,
D. Connecticut.

June 17, 1997.

Laviano Law Offices, P.C. by William M. Laviano, Ridgefield, CT, for plaintiff.

Richard Blumenthal, Atty. Gen. of the State of Connecticut by Margaret Quilter Chapple, Asst. Atty. Gen., Stamford, CT, for defendants.

## OPINION

### Amended Findings on Liability and Damages

MOTLEY, District Judge.

### PROCEDURAL HISTORY

Plaintiff, a former Connecticut State Police Trooper Trainee, brought this employment discrimination action against his employer, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"). This court, after a trial on the merits, rendered a decision on July 11, 1996 finding defendants liable for firing plaintiff because of his race. *Evans v. Connecticut,* 935 F.Supp. 145 (D.Conn.1996). The court now amends its opinion on liability, which included its findings of facts, to include the fact that Evans graduated 17th out of his Connecticut Police Academy class of 55. (see Transcript Hearing on Damages, dated October 10, 1996, 204).

In accordance with a ruling during trial,[1] issues of back pay and reinstatement were considered after the finding of liability. On July 15, 1996, plaintiff moved for a hearing on remedy, limited discovery and designation of an expert to assess back pay damages and the plausibility of reinstatement, which was granted. 168 F.R.D. 118 (D.Conn.1996). The court also ruled that Evans' request, pursuant to Rule 37 of the Federal Rules of Civil Procedure ("Rule 37"), for default judgment and attorney's fees for defendants' failure to produce relevant records throughout this case would be taken up at the damages phase of the case. *See, Evans,* 935 F.Supp. at 159 n. 23.[2] A hearing was set for October 10, 1996.

After the court granted the hearing on damages, both parties submitted a plethora of pleadings and motions alleging that the other was not complying with discovery. On August 20, 1996, defendants requested leave to depose plaintiff and his expert. Defendants also noted that plaintiff had not fully complied with their first set of interrogatories and production requests, dated April 20, 1990. Defendants moved the court to compel plaintiff to supplement his previous responses to the interrogatories and production requests by September 15, 1996. On Septem-

---

1. The bench trial of this case was left open for a period during which a court appointed expert, Special Master Professor Emeritus Burke Marshall of the Yale Law School, analyzed information provided by defendants concerning personnel records and other material related to plaintiff and other members of his class from the Police Academy. At a hearing regarding the Special Master's findings, the court indicated that introduction and consideration of plaintiff's damages and reinstatement, if any, would await a finding on liability. (see Transcript of Hearing, dated 12/14/95, p. 50–51); *see also, Evans v. State,* 168 F.R.D. 118 (D.Conn.1996).

2. As a prevailing party under Title VII, plaintiff also seeks attorney's fees pursuant to 42 U.S.C. § 2000e–5(k).

ber 5, 1996, the court granted defendants' request to take the depositions and ordered plaintiff to supplement his response to defendants' requests by September 20, 1996.

On September 23, 1996, by a faxed motion, plaintiff moved to compel defendants to adhere to their noticed deposition dates of Evans and Woundy on September 24, 1996 and September 26, 1996, respectively. Additionally, plaintiff moved the court to order defendants to confirm plaintiff's 30(b)(6) deposition of defendants, noticed for September 30, 1996. In an effort to give defendants an opportunity to respond to plaintiff's motion, the court waited two hours and then, by faxed order, granted plaintiff's motion directing defendants to adhere to the deposition dates.[3] Shortly thereafter, defendants faxed a reply to plaintiff's motion and the court's order, asserting that plaintiff had not complied with the court's September 5th Order and that plaintiff had been informed that defendants would not confirm the deposition dates until he supplemented the interrogatories.

Defendants also moved to vacate the court's order arguing that they would be prejudiced if forced to proceed with the deposition without having had an opportunity to review the documents requested from the plaintiff. In opposition to defendants' motion, plaintiff argued and proved that he did not violate the court's order because he had been instructed by the defendants to bring the documents with him to his deposition (see Defendants' Notice of Deposition, dated August 20, 1996), which he was intending to do. During Evans' deposition, plaintiff's counsel called chambers requesting a ruling on Rule 30(c).[4] Defendants argued that the rule did not permit plaintiff to raise evidentiary objections but only objections as to form while plaintiff argued otherwise. By faxed order, the court notified the parties that objections to form or substance may be noted although the witness still had to answer and that all objections would be ruled on by the court at a later date.

On September 27, 1996, plaintiff faxed a motion requesting the court to compel defendants to produce a witness with knowledge for the 30(b)(6) deposition, scheduled for September 30, 1996. Plaintiff's counsel alleged that at Evans' and Woundy's depositions, defendants voiced confusion as to the scope of the 30(b)(6) deposition and were informed on both days of what was expected. Plaintiff further alleges that after faxing a follow up letter on September 26, 1996,[5] indicating that the scope of the deposition would include assumptions or errors made in Woundy's report and issues concerning state trooper salaries, benefits, pension plans and availability of overtime beginning in 1986 (the year plaintiff was terminated), defendants failed to confirm the production of a witness with knowledge on these matters. Defendants' counsel allegedly asserted that if such a witness could only be found at the state Comptroller's office, he was not required to produce such a witness because the Comptroller's office was a different state agency.

Plaintiff moved the court to preclude defendants from questioning or asserting any factual matters on back pay, reinstatement or front pay if defendants failed to provide a witness with knowledge for the court ordered deposition. In response, defendants stated that they would attend the deposition and produce a witness that could answer ques-

---

**3.** Because the damages hearing had been delayed and rescheduled previously and because of the time element with the depositions being scheduled for the next day, faxes (and phone conferences) were used and permitted by both sides for the purpose of expediting discovery.

**4.** Rule 30(c) reads in part: "examination and cross-examination of witnesses may proceed as permitted at the trial under the provisions of the Federal Rules of Evidence except as to Rule 103 and 615." Fed.R.Civ.P. Rule 30(c). Rule 103 deals with rulings on evidence, effects of erroneous rulings, etc., while Rule 615 deals with the exclusion of witnesses during the testimony of other witnesses.

**5.** Plaintiff faxed the letter pursuant to Local Rule 9 which reads in relevant part; "No motion pursuant to Rule 26 through 37, Fed.R.Civ.P., shall be filed unless counsel making the motion has conferred with opposing counsel and discussed the discovery issues between them in detail in a good faith effort to eliminate or reduce the area of controversy, and to arrive at a mutually satisfactory resolution." Civil Rule 9 of the U.S. District Court for the District of Connecticut.

tions regarding payroll records, benefits, and other data that were given to plaintiff. Defendants argued, however, that plaintiff was asking the court to order the production of a witness to address purely legal questions on the calculation of back pay, front pay and reinstatement which were to be determined by the court at the hearing. Furthermore, defendants argued that plaintiff sought a witness to address the Woundy report, a subject matter not designated in his notice of deposition.[6]

On September 30, 1996, following the deposition of defendants' witness, Judith Hess, a payroll supervisor, plaintiff informed the court, by fax, that Hess could not answer questions regarding benefits, the assumptions or errors in Woundy's report, or reinstatement. Plaintiff maintained that he was not asking defendants to calculate back pay but was asking defendants to disclose the state's method in calculating back pay based on it's policies and procedures, including the figures and assumptions involved in it's calculation, which could affect the expert's assumptions made, based on the information or the lack of information provided to him. Plaintiff argued that these issues fell clearly within the scope of discovery in a damages case. (see Transcript of Hess Deposition, dated September 30, 1996, 80–82) (Tr. Dep. Hess). Plaintiff also noted for the record that he would move to preclude any evidence defendants attempted to introduce at the hearing that was not disclosed by Hess during discovery, (Tr. Dep.Hess, 78), and that Woundy would be recalculating his numbers based on the new information disclosed by Hess. (Tr. Dep.Hess, 51).

The night before the hearing, defendants informed plaintiff, by a faxed letter, that Hess would testify at the hearing on Woundy's calculation of income and that Sue Fabian from the Comptroller's Office would testify regarding the state's calculation of pension benefits and the conditions under which an employee was reimbursed for the cost of health benefits. The next day at the hear-

ing, plaintiff moved to preclude any examination or proffering of evidence relating to false assumptions, errors in compensation rates, raises, overtime or pension compensation which were not disclosed to plaintiff at the 30(b)(6) deposition of defendants. (see Plaintiffs Motion in Limine and Transcript of Damages Hearing, dated October 10, 1996, 27–30) ("Tr.").

The court granted the motion and prevented defendants from submitting evidence contrary to the assumptions made in the Woundy report, particularly in regards to overtime (Tr., 51–53, 58–59, 142–144) and pension and benefits (Tr., 150–158). The court pointed out that defendants could not introduce the factors the state would have considered in determining plaintiff's speculated overtime, nor could they now produce a witness from the Comptroller's office to testify on pension and benefits calculations. (Tr., 43–44).

The court also barred defendants from recalling Hess to testify about any information she did not disclose at the 30(b)(6) deposition. (Tr., 238). Plaintiff maintained that when Hess was asked if she knew of benefits, overtime and the figures in Woundy's report she said no. Plaintiff offered the transcript of the deposition into evidence without objection. Plaintiff cited, from the transcript, several examples of Hess' lack of knowledge. (Tr., 214, 220). The following are excerpts from defendants' 30(b)(6) deposition;

Q. So it would be fair to say that, subsequent to the Notice of Deposition and the areas upon which you were to testify, you have done nothing to familiarize yourself or prepare yourself to testify here today?

A. That's correct.

Q. Okay. Are you familiar with the calculation of pension benefits and the awarding of pension benefits to state troopers?

A. No.

Q. Would it be fair to say that you, as opposed to the Controller's Office, are to-

---

6.  Plaintiffs Notice of 30(b)(6) Deposition requested a witness to testify on the following subjects: "1 .) The amount of back pay due to Harold Evans in the event the Court's order on liability is upheld. 2.) *The method (s) by which the defen-*

*dant would calculate back pay pursuant to the order of the Court.* 3.) Any claim of fact whereby you assert that Mr. Evans is ineligible for reinstatement or back pay." (see Plaintiffs Notice of Deposition).

tally unfamiliar with pension plan and pension benefits?

A. Basically, all we do is look for the information as to salaries. We send it over to the controllers and they take care of all the pension information.

Q. What familiarity do you have with the conditions under which it is feasible or not feasible to reinstate a trooper who has for one reason or another, lost his job?

A. None at all.

Q. You have no familiarity with whatever standards are applicable?

A. That's right ... (Tr. Dep.Hess, 8–9).

When asked about overtime, Hess manifested the same lack of knowledge.

Q. Let me ask you this. You commented on how overtime is awarded. Is it awarded on a totally random basis?

A. I would have no idea.

Q. How is regular overtime assigned, do you know?

A. I would have no idea.

Q. Is it voluntary?

A. Yes. That much I do know. It's never forced.

Q. In preparing for the deposition today, did you make any effort to determine who would know the answer to these questions regarding overtime?

A. No, I didn't, because I would have no idea those would be the questions you would be asking. (Tr. Dep.Hess, 17–19).

Furthermore, when Hess was asked about the Woundy report which she admitted to being given for review that morning on the way to the deposition by defense counsel, she said she was incapable of commenting on his calculations.

Q. Would you please answer whether there's anything in that document [the report] with which you disagree factually after having read it?

A. I couldn't make any kind of comment as to figures ...

Q. Do you understand what I am saying?

A. Yes, I do. And truthfully, I can't make, even after reading this any judg-ments on the future assumptions of his or anyone else's.

Q. I'm not asking you to do that. I'm asking for factual errors in the factual assumptions that [the expert] made that he based upon your data and the information the State Police has, you know, to be incorrect.

A. For future assumptions?

Q. Yes. (Tr. Dep.Hess, 23, 28).

Defendants argued that Hess did assert challenges to the assumptions and calculations in the Woundy report and that by the court barring the recalling of Hess, the state was not being given the opportunity to cross examine Hess on her deposition testimony. Plaintiff asserted that defendants were given the opportunity to cross examine their witness during the deposition, in accordance with this court's order clarifying Rule 30(c). The court barred defendants' attempt to re-call Hess and informed defendants that the court had already allowed examination of Hess when she was called on direct and that it would not permit defendants to introduce undisclosed information via cross examination. (Tr., 217–223). The court reasoned that what defendants sought to introduce was precisely the information requested during discovery by plaintiff in his notice of deposition and ruled that it was not going to be disclosed for the first time at the hearing. (Tr., 162, 163, 238).

Lastly, the court rejected defendants' argument that since the court was barring the admission of any undisclosed information produced after the 30(b)(6) deposition, it should bar plaintiff's evidence on front pay which defendants alleged was not disclosed until after the deposition. The court ruled that defendants had been put on notice about front pay long before the 30(b)(6) deposition, by Woundy's original report dated September 20, 1996 and the various amendments, including the final October 1, 1996 report, and by plaintiff's letters to the defendants, dated September 26th and 30th. (Tr., 63–65). At the close of the hearing, the court noted that a written opinion on plaintiff's

damages, Rule 37 motion,[7] which this court tabled until a finding of liability, and application for attorney's fees would be forthcoming. The court addresses, herein, it's finding as to plaintiff's damages, Rule 37 motion, and application for attorney's fees.

## DISCUSSION

### I. Remedy

Although amendments to Title VII contained in the Civil Rights Act of 1991 expanded the remedy available to a plaintiff, plaintiff, in this case, was terminated prior to the enactment date of the Act on November 21, 1991. *See, Brooks v. Fonda–Fultonville Cent. School,* 938 F.Supp. 1094, 1107 n. 5 (N.D.N.Y.1996). Plaintiff is limited to the damages available prior to the amendments to Title VII contained in the Civil Rights Act of 1991 since the amendments are not retroactive. *Id.; Postema v. National League of Professional Baseball Clubs,* 998 F.2d 60 (2d Cir.1993) (Civil Rights Act of 1991 section conferring right to trial by jury and allowing recovery of compensatory and punitive damages did not apply retroactively to claim arising before Act's effective date). Hence, neither punitive nor compensatory damages are recoverable under Title VII claims in this case, *see, Walker v. Ford Motor Co.,* 684 F.2d 1355, 1363–64 (11th Cir.1982), nor awards of pain and suffering. *Carrero v. New York City Housing Auth.,* 890 F.2d 569, 581 (2d Cir.1989).

Upon a finding of liability under Title VII, a plaintiff is ordinarily entitled to back pay from the date of termination until the date of judgment, including prejudgment interest on the back pay award. *Clarke v. Frank,* 960 F.2d 1146, 1154 (2d Cir.1992) (court held it was ordinarily an abuse of discretion not to award pre-judgment interest on a back pay award); *Saulpaugh v. Monroe Community Hospital,* 4 F.3d 134, 144–45 (2d Cir.1993),

cert. denied, 510 U.S. 1164, 114 S.Ct. 1189, 127 L.Ed.2d 539 (1994) (pre-judgment interest is to be compounded given the goal to make plaintiff whole); *Loeffler v. Frank,* 486 U.S. 549, 558, 108 S.Ct. 1965, 1971, 100 L.Ed.2d 549 (1988). The general availability standard for awarding back pay was first adopted by the Supreme Court in *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). The Court acknowledged that back pay was not automatic or mandatory but was a remedy that could be invoked by district courts, *id.* at 415, 95 S.Ct. at 2370, and ruled that district courts were granted discretionary choices as to an appropriate remedy,[8] which were equitable in nature and had to be exercised "in light of the large objectives of the Act." *Id.* at 416, 95 S.Ct. at 2371; *Hecht Co. v. Bowles,* 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754 (1944).

### A. Back Pay

The purpose of a back pay award under Title VII is to "make persons whole for injuries suffered through past discrimination," *Reed v. A.W. Lawrence & Co., Inc.,* 95 F.3d 1170 (2d Cir.1996) (citing *Loeffler,* 486 U.S. at 558, 108 S.Ct. at 1971), by completely redressing the economic injury the plaintiff has suffered due to the unlawful actions of the defendant. *Saulpaugh,* 4 F.3d at 145 (injured party made whole by being put in position he would have been in 'but for' the employment discrimination); *see, Albemarle,* 422 U.S. at 418, 95 S.Ct. at 2372. Therefore, a back pay award should consist of lost wages, pay increases, fringe benefits like insurance, medical and pension benefits, and overtime. *Id. see also, Ingram v. Madison Square Garden Center, Inc.,* 482 F.Supp. 918 (S.D.N.Y.1979); *Bonura v. Chase Manhattan Bank, N.A.,* 629 F.Supp. 353 (S.D.N.Y.1986) (award includes those benefits that would have accrued to plaintiffs in the course of

---

7. The facts leading to the filing of the Rule 37 motion will be briefly discussed when that issue is addressed.

8. Title VII reads in relevant part: "If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay, or any other equitable relief as the court deems appropriate." 42 U.S.C. § 2000e–5(g)(1).

their employment with defendants if they had not been discriminatorily discharged).

■ Any calculation of a back pay award must be reduced by "interim earnings or amounts earnable with reasonable diligence." 42 U.S.C. § 2000e–5(g). Defendant bares the burden of establishing that plaintiff failed to mitigate damages. *Clarke*, 960 F.2d at 1152. In order to meet its "extremely high" burden of proving failure to mitigate, defendant "must show that the course of conduct plaintiff actually followed was so deficient as to constitute an unreasonable failure to seek employment." *Bonura*, 629 F.Supp. at 356 (quoting *EEOC v. Kallir, Philips, Ross Inc.*, 420 F.Supp. 919, 925 (S.D.N.Y.1976), *aff'd*, 559 F.2d 1203 (2d Cir.), *cert. denied*, 434 U.S. 920, 98 S.Ct. 395, 54 L.Ed.2d 277 (1977)). Given the purpose of the employment discrimination laws and the fact that defendants have presented no evidence showing why back pay relief should be denied, the court finds that back pay is appropriate in this case. Since plaintiff bears the initial burden of establishing damages, the court now turns to the Woundy report for evidentiary support on plaintiff's back pay damages.

In determining a back pay award of plaintiff's losses to date (from January 1, 1987 through September 30, 1996), Woundy included Evans' lost salary, pension benefits, and loss of two other types of benefits, namely health insurance and use of the company car. For lost salary, Woundy provided three varying calculations which were based on the top 10 earners of plaintiff's police training classmates, on only the male classmates, and lastly, on both the male and female classmates. Woundy concluded that the calculations based on the top 10 earners were the most appropriate assessment of plaintiff's lost salary given his past work history. Defendants contend that it is unreasonable to assume that Evans would be among the top 10 earners from 1987–1996, considering the fact that only one of the top earners appeared on the list for all the years in question.

Woundy's opinion turned on the availability of overtime. He testified at the hearing that if overtime was readily available to Evans, Evans' total earnings would not be reflected in the average earnings of his classmates but would more closely resemble the top 10 members of his class. (Tr., 86). He based this conclusion on Hess' testimony of overtime being voluntary and on Evans' past work history. Woundy pointed to 1986 (the last year Evans worked for the police department) when Evans earned 71 percent more than his contract rate by working substantial amounts of overtime and was among the highest earners in his class. (Tr., 86–87). He also noted, as the record before the court reflects, even today, Evans exhibits the same propensity for working more than the traditional 40 hours per week. (Tr., 87).

In the early part of 1996, Evans worked on average seven days a week with a full time job at Hilton Hotel and a second job on the weekends as a security officer at a hospital. Woundy testified that Evans currently works at a hotel in New York, as an Assistant Director of Security, sometimes working more than 12 hours a day. (Tr., 88). Woundy asserted that he, like other experts in the human resources field, generally looks at an employee's work history to determine how an employee will perform in the future. (Tr., 88). Although Evans' status as a top 10 earner is not conclusive, given the evidence, the court accepts Woundy's assumption and notes that in determining damages, "all doubts are to be resolved in favor of the injured party; the wrongdoer does not become the beneficiary of his own wrongful conduct." *E.E.O.C. v. Kallir*, 420 F.Supp. at 923; *Koyen v. Consolidated Edison Co. of N.Y., Inc.*, 560 F.Supp. 1161, 1169 (S.D.N.Y. 1983) (Wrongdoer shall bear the risk of uncertainty which his wrong created); *Buckley v. Reynolds Metals Co.*, 690 F.Supp. 211, 216 (S.D.N.Y.1988) (Defendant cannot complain of uncertainty when that uncertainty has been caused by its own acts). Hence, the following is Woundy's computation of Evans' lost salary, as a top 10 earner, in the years 1987–1996;

| Year | Class | Evans | Difference | Brought to Present Value |
|------|-------|-------|------------|--------------------------|
| 1987 | $40,000.23 | $21,000.00 | $19,000.23 | $ 39,233.92 |
| 1988 | $39,724.65 | $25,000.00 | $14,724.65 | $ 29,018.33 |
| 1989 | $41,837.38 | $36,111.00 | $ 5,726.38 | $ 10,136.50 |
| 1990 | $47,003.80 | $18,831.00 | $28,172.80 | $ 46,090.23 |
| 1991 | $49,626.80 | $24,144.94 | $25,481.86 | $ 37,199.17 |
| 1992 | $48,566.39 | $13,568.88 | $34,997.51 | $ 45,891.74 |
| 1993 | $59,947.21 | $11,810.12 | $48,137.09 | $ 57,121.37 |
| 1994 | $62,293.63 | $20,270.00 | $42,023.63 | $ 48,184.82 |
| 1995 | $67,529.88 | $22,762.00 | $44,767.88 | $ 47,713.60 |
| 1996 | $55,627.89 | $23,098.23 | $32,529.66 | $ 32,529.66 |
| | | Total | | $393,119.35 |

(see October 1, 1996 Woundy Report, Exhibit A).

As shown, Woundy mitigated Evans' damages for each year by deducting Evans' interim earnings, as provided by Evans and his income tax returns, from the earnings of the top 10 earners in his class and brought the difference to its present value.[9] Woundy added up the present value of each year to reach a sum total of $393,119.35 of lost wages due to plaintiff. At the hearing, defendants questioned Woundy on the credibility of his figures on Evans' salary, given the fact that Evans did not produce tax returns for the years 1987 and 1988 and that from 1990 to 1992 Evans filed joint tax returns that included his wife's earnings. Defendants pointed out that Woundy's sole method of determining Evans' salary for those years and for subtracting the income from his wife was based on what Evans told him. Woundy replied that it was not unusual in his experi-

ence for a plaintiff in a back pay suit to not have all his tax records, particularly given the number of years under consideration in this suit. The court accepts Woundy's statement of facts in his report as to Evans' interim earnings and the deduction of Evans' wife's earnings of $12,000.00 in 1990 through 1992. Woundy has made a concerted effort in preparing a document to reflect the losses of this plaintiff and little evidence has been submitted for this court to doubt his credibility.

At the hearing, in an effort to establish that plaintiff failed to mitigate his damages by seeking employment, defendants argued that plaintiff did not produce any documentation showing his consistent and steady attempt to find employment since his termination with the state police.[10] Plaintiff explained that since his termination, he has worked as a limousine driver and has ap-

9. The present value was calculated by taking the value of the difference and multiplying it by an interest rate taken from the U.S. Government's 10–year securities average rate for the year in question. (Tr., 78–79).

10. On December 18, 1996, defendants moved to reopen the hearing on damages and to conduct further discovery based on information obtained from plaintiffs former employers. Defendants asserted that, as of 1992, plaintiff had been fired from several jobs due to sexually inappropriate behavior and that plaintiff had failed to disclose this information during discovery, although he was specifically asked to provide explanations and reasons for his departure from his places of employment. Defendants argued that further discovery was required to establish plaintiffs ineligibility for reinstatement, given the state department's policy prohibiting such conduct, and for front pay in lieu of reinstatement. Defendants also noted that any award of back pay should be tolled from the date of these terminations. On January 13, 1997, this court denied defendants' motion on the grounds that plaintiff was no longer seeking reinstatement as a remedy. As indicated, this court notes that plaintiff was ordered to bring his supplemental responses to defendants' interrogatories to plaintiffs deposition on September 20, 1996. Plaintiff provided a list of 7 of his former employers, including those who allegedly fired plaintiff because of improper conduct. At no time, did defendants thereafter inform the court that plaintiffs responses were inappropriate or incomplete. With the list of employers, defendants had every opportunity, *during discovery*, to investigate the causes of Evans' termination, rather than initiating an investigation several months past the discovery deadline and the hearing on damages. Therefore, defendants' after acquired information will not serve as a basis for tolling of plaintiffs back pay award nor will it be considered in the court's decision on reinstatement and front pay.

plied a substantial number of times with different police agencies throughout the tri-state area, being denied employment, despite a Connecticut Police Department employment reference. The Woundy report noted that Evans held employment as a partial owner of an "I Can't Believe It's Yogurt" business and had worked as a security officer for various hotels. The report also establishes that income from each place of employment, including income derived from Evans' partial ownership, were deducted accordingly from the lost salary calculations.

■ Defendants maintained that plaintiff's failure to secure employment with the various police departments was due to plaintiffs failed efforts to pass the police examination and not due to any continued discrimination on the part of the Connecticut State Police. Plaintiff testified that he did in fact fail the exam a few times, but that he continued to seek employment in his field and was not told in the majority of instances why he was denied employment. The court finds that defendants have failed to meet their burden of proving plaintiff's failure to mitigate. Defendants' burden is 'extremely high' and cannot be "satisfied merely by a showing that there was further actions that plaintiff could have taken in pursuit of employment. Rather, defendants must show that the course of conduct plaintiff actually followed was so deficient as to constitute an unreasonable failure to seek employment ... plaintiff must be given the benefit of every doubt in assessing [his] conduct." *E.E.O.C. v. Kallir*, 420 F.Supp. at 925. The court finds that plaintiff is entitled to $393,119.35 in lost wages.

■ Woundy also calculated the value of plaintiffs lost pension benefits. Woundy based his calculations on the state pension plan found in the Connecticut State Employees Retirement System–Tier II, revised May 1, 1991. According to that plan, Woundy asserted that an employee working in hazardous positions, like Evans', was entitled to a pension of 50% of the average of his high-

est three years of income, provided he remained on the force for twenty years. Woundy explained that, in the pension calculations, he used the average of the highest three years of Evans' lost wages, multiplied it by 2.5% (which represents the full plan of 50% over a twenty year period) of the years of Evans' service (11.25), and discounted that amount ($280,935.13) to its present value of $160,637.89. (Tr., 80–81).

Defendants argue that Woundy used the wrong formula (2.5%) in calculating plaintiff's pension benefits. Defendants assert that the retirement plan did not entitle employees who left voluntarily before twenty years to a 50% return but only entitled them to a refund of their contributions with interest. However, as Woundy pointed out, the plan does not provide a formula for when a person does not leave voluntarily or leaves for reasons beyond his control, as was the case with Evans. (Tr., 146–149). The court notes that since the aim of a Title VII award is to make plaintiff whole, Evans should not be penalized or suffer any economic loss in the calculation of his pension entitlement due to the state's discriminatory firing or due to the lack of definition of all contingencies in the state's retirement plan. Therefore, this court accepts Woundy's finding and holds that plaintiff is entitled to $160,637.89 of lost pension benefits.

■ Lastly, plaintiff claims a loss of company car and health insurance benefits. Woundy testified at the hearing on damages that he included loss of company car as a benefit because according to the labor agreements provided to him by the State, Evans, as a police officer, would have been entitled to personal use of the state vehicle with a few restrictions. (Tr., 160–161). However, Woundy asserted that because the State failed to provide information regarding the restrictions on personal use of the state vehicle, he calculated the value of the company car benefit without knowledge of the restrictions.[11] From 1987 to October, 1, 1996,

11. At the hearing on damages, defendants argued that they did not produce information on the usage of the state vehicle because they did not considered the use of the vehicle to be a benefit but an obligation, since the Connecticut State Police considered troopers to be on duty 24 hours a day. (Tr., 161). The court barred defendants from admitting evidence challenging

Woundy calculated the combined present value total of the company car and lost health insurance benefits to be $91,919.19.

The report stated that had Evans remained with the State of Connecticut, his insurance would have been provided without cost and insurance for his children would have been provided at a minimal cost. Woundy estimated the state's cost at $125.00 per month from 1987 to 1990 and from 1990–1993, estimated it's cost at $400.00 per month for Evans and his family. From 1994 until the present, Woundy deducted Evans' actual out-of-pocket cost for health insurance from the state's cost.

This court finds that except for the years 1994 to 1996, plaintiff has failed to submit any proof that his lack of health insurance from 1987 to 1993 caused him any economic injury or left him in a different position than he would have been in had he had the insur-

ance.[12] Therefore, the court offsets his claimed benefit losses by the health insurance benefits calculations for years 1987 to 1993.[13] The court finds that plaintiff can only be compensated for his actual out of pocket cost of medical insurance from 1994 to 1996. The court finds that plaintiff is entitled to $56,360.57 in lost benefits, which is the present value of the sum of plaintiffs out of pocket health insurance plus the value of his loss company car benefits.[14]

The court finds that plaintiff is entitled to a back pay award in the amount of $610,117.81 which is the total of his lost wages ($393,119.35), pension benefits ($160,637.89), and company car and out of pocket cost of health insurance benefits ($56,360.57). The court finds that plaintiff is also entitled to pre-judgment interest,[15] compounded annually, in the amount of $161,909.27.[16] Plaintiff

Woundy's assumption on company car usage and showing the limitation on this benefit because defendants failed to produce documents which would have enlightened the expert on what the benefit was and what the restrictions were, if any. (Tr., 162). The court informed defendants that they were not being barred from admitting the evidence because the evidence was irrelevant but because defendants failed to produce the documents prior to the hearing on damages. (Tr., 163).

12. Woundy testified that neither Evans nor Evans' tax returns indicated any medical cost deductions for these years.

13. Woundy calculated Evans' total lost health care benefits as $44,636.62. The court deducts from this amount $35,558.63 which is the estimated value of the health care benefits for years 1987 to 1993.

14. Woundy calculates the present value of plaintiffs health insurance benefits from years 1994 to 1996 as $9,077.99 and calculates the present value of plaintiffs lost car benefits from years 1987 to 1996 as $47,282.58. These figures combined equals the present value total of plaintiffs lost benefits.

15. The court finds that plaintiff is entitled to pre-judgment interest because Woundy, in calculating present value, simply adjusted the past dollars plaintiff would have had in past years to compensate for their diminished purchasing power (value) today as a result of inflation, using as a guide the U.S. Treasury Bill Rate. Woundy was not calculating the value of the money as if it

had been given to Evans for his use or for investment over the last ten years. In *Chandler v. Bombardier Capital, Inc.*, 44 F.3d 80 (2d Cir. 1994), the court dealt with the same issue. There it said: "the [expert] adjusted the dollars [plaintiff] would have earned in past years to compensate for their diminished purchasing power resulting from inflation. Thus, the adjustment was intended to give [plaintiff] dollars carrying the same purchasing power today that he would have received at the time his salary accrued. That does not compensate for loss of use of the money in the intervening time." *Id.* at 81–82; *Miner v. City of Glens Falls*, 999 F.2d 655 (2d Cir.1993) (pre-judgment interest award affirmed because considered necessary to fully compensate [plaintiff] for being deprived the use of his salary).

16. The Second Circuit has not ruled on a particular pre-judgment interest rate. Courts in this Circuit have used various interest rates including the post-judgment interest rate provided in 28 U.S.C. § 1961(a) which is the treasury bill rate. *See, Katsaros v. Cody*, 744 F.2d 270, 281 (2d Cir.), *cert. denied*, 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984). This court awards pre-judgement interest by using the average of the post-judgment interest, treasury bill rates, provided in 28 U.S.C. § 1961(a), for 1987 through 1996. 6.77% was the average interest rate for 1987, 6.98% for 1988, 8.54% for 1989, 7.90% for 1990, 5.88% for 1991, 3.92% for 1992, 3.46% for 1993, 5.26% for 1994, 6.04% for 1995, and 5.53% for 1996. Interest was compounded annually on the sum of plaintiff's lost earnings and loss out of pocket health care and loss car benefits for the given year. Since Woundy discounted the pension benefit amount to reflect its pres-

therefore is entitled to $772,027.08, the sum of the back pay and pre-judgment interest awards.

## B. Reinstatement

■ Like back pay, reinstatement is not mandatory and is only to be denied if it frustrates the central purpose of the statute. Courts have acknowledged that there are times when reinstatement is impractical and should not be granted, such as when the employee-employer relationship has become hostile and has been irreparably damaged due to on-going litigation or when the position in question no longer exists or has changed substantially. *See, Whittlesey v. Union Carbide Corp.*, 742 F.2d 724, 728 (2d Cir.1984); *Reed*, 95 F.3d 1170, 1182 (2d Cir. 1996); *Rose v. Ireco, Inc.*, 872 F.Supp. 1127, 1135 (N.D.N.Y.1994); *Talada v. International Service System, Inc.*, 899 F.Supp. 936, 957 (W.D.N.Y.1995); *Frank v. Relin*, 851 F.Supp. 87 (W.D.N.Y.1994) (courts are to weigh all the factors and surrounding circumstances in a particular case in determining whether reinstatement is an appropriate remedy, including when the position has undergone change). In *Frank v. Relin*, the district court ruled that reinstatement was inappropriate for a former employee of a county district attorney because her position had changed considerably in the approximate eight years since her termination.

In this case, plaintiff asserted, at the hearing on damages and in his post hearing brief, that he no longer seeks reinstatement. He also argued that reinstatement was inappropriate because the relationship between himself and his former employer, the State Police, had become hostile and damaged as a result of the ensuing litigation. Plaintiff contended that defendants had exhibited considerable hostility towards him by ignoring the letters he sent to both the police union and defendants' attorney (the Connecticut Attorney General) requesting information about the conditions of his reinstatement. Defendants argued that neither of plaintiff's letters could serve as a basis of determining the sentiments of the police department nor Evans' potential fellow officers since neither letter was sent directly to the employer.

The court finds that plaintiff has not submitted enough evidence to establish that the employee-employer relationship between himself and the Connecticut State Police has become so irreparably damaged and hostile as a result of this litigation. *See, EEOC v. Kallir*, 420 F.Supp. at 926 (antagonism are the natural result of litigation and denying reinstatement on this basis alone may be contrary to the purpose of Title VII); *Sims v. Mme. Paulette Dry Cleaners*, 638 F.Supp. 224, 225 (S.D.N.Y.1986) (citing *Taylor v. Teletype Corp.*, 648 F.2d 1129, 1138–1139 (8th Cir.), *cert. denied*, 454 U.S. 969, 102 S.Ct. 515, 70 L.Ed.2d 386 (1981)). At the hearing, the court noted that the letter written to the union was only written a month ago and may not serve as an adequate basis of concluding that police officers in the union harbored hostile feelings toward Evans.

However, the court gives considerable weight to Evans' withdrawal of his request for reinstatement. The Court rules that since Evans no longer desires to be a Connecticut State Police Officer, reinstatement would be impractical in this case.[17]

---

ent value as of 1996 (the year Evans is entitled to draw pension) interest on the pension benefit amount was compounded at the 5.53% interest rate average for 1996 only.

**17.** The court also notes that even if Evans wanted to be reinstated, reinstatement would still be impractical given the nature and condition of the job, the considerable change the position has undergone, and the length of time plaintiff has been off the force. It would seem that a situation such as this, where the plaintiff has been out of the job for over a decade, particularly at a job where specialized training, equipment, and experience are required, is a prima facie case of the inappropriateness of reinstatement. Since Evans' termination eleven years ago, law enforcement agencies have upgraded their guns and equipment, reporting and computer systems and method of arrests, all of which have increased the efficiency of the employee on the job. Defendants assert that if reinstated, plaintiff would have to go back to training for about a year to catch up and be educated on contemporary changes. Essentially, plaintiff would not be reinstated to the same position but would have to begin again as a new enrollee in the police academy. Plaintiff has suffered a great loss of eleven years of experience and for that reason alone this court would find reinstatement inappropriate.

## C. Front Pay

District Courts have been granted the broad discretionary power in determining whether to award front pay as a possible equitable remedy for plaintiff's damages. *Barbano v. Madison County*, 922 F.2d 139, 149 (2d Cir.1990) (citing *Carrero v. New York City Housing Authority*, 890 F.2d 569, 570 (2d Cir.1989)). If reinstatement is deemed inappropriate, a plaintiff must show that he is entitled to front pay in lieu of reinstatement as an equitable remedy for continued (future) damages he will suffer as a result of defendant's unlawful conduct. *Reed*, 95 F.3d at 1182; *see also, Whittlesey*, 742 F.2d at 728; *Frank*, 851 F.Supp. at 93. Additionally, it is not an abuse of discretion if the court finds that back pay is sufficient to make plaintiff whole. *Saulpaugh*, 4 F.3d at 145; *Barbano*, 922 F.2d at 147 (holding that because district court impliedly determined that other relief was sufficient, denial of front pay award was not an abuse of discretion).

▮ In exercising its discretionary power, this court finds that plaintiff has not established that he is entitled to front pay. The court also notes that the damage that plaintiff may suffer in the future, as a result of not being reinstated as a police officer, is not due solely to defendants' unlawful termination of plaintiff but is also due to his failure to bring this case to trial in an expeditious manner. Reinstatement is inappropriate to some degree due to the length of time that has passed. As the record will reflect, the plaintiff is as much at fault as the defendants in prolonging the closure of this case.

During trial this court found that certain documents were necessary for both sides. After three or four attempts to get defendants to produce the documents, the court appointed a special master, Burke Marshall, to review the documents to compare plaintiff's performance with that of his classmates who were not discharged. Marshall informed the court that defendants did not produce the necessary documents, despite defendants' contention that they had.

When this court finally called the case to trial on its merits, plaintiff's counsel, William Laviano ("Laviano"), resisted with the excuse that his wife was the attorney for the case and was in the hospital and unavailable for trial. The court denied plaintiff's request for postponement since he had been given one earlier from December, 1993 to January, 1994 and ordered plaintiff to go forward. When trial commenced, both Laviano and his wife were present. This court finds that plaintiff failed to prepare for trial by requesting and examining the relevant records prior to trial and had made no effort to get a prompt trial, at any point, prior to a hearing on damages. Reinstatement, which plaintiff was originally seeking, may have been possible had he expedited these proceedings. This court finds that plaintiff is not entitled to front pay in lieu of reinstatement. However, the court finds that plaintiff is entitled to $772,027.08 in back pay and pre-judgment interest and rules that plaintiff is made whole by this award.

## II. Rule 37 motion

### A. Underlying facts

The trial of this case began on January 12, 1994.[18] Due to the complex nature of this litigation, the court adjourned trial and appointed an expert,[19] Yale Professor Emeritus Burke Marshall ("Marshall"), to take possession, review, and analyze all documents relat-

---

**18.** Plaintiff was terminated on December 16, 1986. (see, Complaint ¶ 9). On or about April 15, 1987, plaintiff filed a complaint with the EEOC and the CHRO charging race discrimination and bias in regard to the retention of black police officers and his termination. (Id. at 14). On December 11, 1989, plaintiff received his Notice of Right to Sue within 90 days and, on January 15, 1990, plaintiff initiated his Title VII action in federal court by filing his complaint (which was amended several times) alleging employment discrimination based on race. *See*, 42 U.S.C. § 2000e–5(e).

**19.** Rule 706 provides in relevant part: "the court may on its own motion or on the motion of any party enter an order to show cause why expert witnesses should not be appointed ... a witness so appointed shall be informed of the witness' duties by the court in writing ... [and] shall advise the parties of the witness' findings, if any; the witness' deposition may be taken by any party; and the witness may be called to testify by the court or any party. The witness shall be subject to cross-examination by each party ..." Fed.Evid.Rule 706.

ing to plaintiff and other members of his police training class to determine whether the reasons offered by defendants for terminating Evans were legitimate and based on objective criteria or were a pre-text for racial discrimination. Plaintiff had filed several motions to compel the production of documents. By order, the court directed defendants to produce the following documents to Professor Marshall on or before April 15, 1996;

1. All performance evaluation reports on all 52 trooper trainees in the 94th Academy Class from 12/20/85 until 12/31/96;

2. All reports and rewrites of reports written by all 52 members of the 94th class for the year 1986, including the criticisms of said reports, and;

3. All documentation for members of the 94th class who were terminated *at any time*, including the material submitted by the barracks, division commanders, labor relations and any other departments, whether the person leaving was white or a minority. (emphasis added). (see Order dated April 4, 1994) (hereinafter, "April 4th Order").

The court directed defendants to submit an index to the documents being reviewed and directed the expert to submit a report that made a specific comparison between the treatment accorded to black trainees and that accorded to white trainees with respect to personal conduct, discipline, and warnings, by June 15, 1994. The court noted that a hearing would be held on the report and that each side would be given the opportunity to make objections and submit additional evidentiary material relevant to the report.

On April 18, 1994, three days after the documents were due to be produced to Professor Marshall, defendants mailed a notice of compliance with the court's April 4th Order, indicating that the records required in

Items 1 and 3 were ready for review and that the index to the records was being compiled. On April 21, 1994, plaintiff's counsel informed the court, by letter, that despite two written requests, defendants still had not produced the documents nor the index. Without the index, plaintiff felt that he would be disadvantaged in preparing for the scheduled May 6, 1994 conference. Plaintiff requested the court to again order immediate production of a full and complete index to the documents. At the May 6th conference, the court amended the April 4th Order by deleting Item 2 of the requested documents. Items 1 and Items 3 remained unchanged.[20]

On June 10 1994, Professor Marshall sent a letter to the court stating that defendants had still not produced documents covered by Item 3 of the court's April 4th Order, as amended, by a June 7, 1994 Order, pursuant to the conference held on May 6, 1994. Marshall indicated that without information relating to the termination of the individuals covered in Item 3, he was unable to make a comparative review with respect to the treatment of minority and non-minority trainees by the June 15, 1994 deadline. A copy of this letter was also sent to the defendants. By order dated June 16, 1994, defendants were ordered to show cause on June 22, 1994 why they should not be held in contempt of the court's April 4th Order, as amended. At the contempt hearing, Mr. Lanoue, standing in for Assistant Attorney General Chapple, who was on vacation at the time, explained to the court that a good faith effort and diligent search had been undertaken to find the documents covered by Item 3. He explained that in a last attempt, Chapple searched in the basement of the headquarters building in Hartford through hundreds of documents and found the requested items.

According to Mr. Lanoue, the documents were disorganized and needed to be copied and indexed before releasing them to plain-

---

20. As to Item 3, plaintiff's counsel asked the court whether he was entitled to the documents regarding anyone who left the training program *at any time* either voluntarily or involuntarily, as the order clearly stated. Defendants' counsel interjected that to her understanding, Item 3 referred only to the documents of individuals who left during the working test period of the

training program or shortly thereafter which was *during 1986.* The court asked defendants' counsel whether she was referring to those who left voluntarily or involuntarily to which she responded, with plaintiff's counsel's subsequent approval, that she was referring to both. (see Transcript of May 6, 1994 Conference, 3–4).

tiff, a task which Chapple said she would do immediately upon her return from vacation the following Monday. The court noted that on prior occasions Attorney Chapple had indicated to the court that all the documents required in this case had been produced and were ready for review by Marshall. Mr. Lanoue responded that, since he was standing in for Chapple, he was not familiar with everything that had or had not happened nor what Attorney Chapple had or had not said. (see Transcript of Contempt Hearing, dated June 22, 1994, 5).

On June 24, 1994, this court found defendants in contempt for failing to comply with its April 4th Order, as amended. The court gave defendants 10 days (until July 2, 1994) to purge themselves by producing the documents and noted that failure to do so would result in a fine of $10,000.00 per day against defendants until such records were produced. On July 1, 1994, defendants sent to Marshall documents of individuals who left voluntarily or involuntarily during 1986. In a letter to defendants, plaintiff asserted that they still had not complied with the court's April 4th Order because Item 3 did not limit production to documents covering 1986. Both parties disputed the meaning of their dialogue at the May 6, 1994 conference where both sought clarification from the court as to the meaning of Item 3. (see Supra footnote 5).

On July 21, 1994, for the purpose of clarification, the court issued an order amending Item 3 to read as follows;

All documentation for members of the 94th class who were terminated at any time, whether within the working test period or thereafter, and whether during 1986 or the late months of 1985, but no later than 1988.

This includes the material submitted by the barracks, division commanders, labor relations and any other departments, whether the person leaving was white or a minority. (see Order dated, July 21, 1994) (hereinafter, "July 21st Order").

On July 25, 1994, defendants notified the court that according to their records, 15 members of the Connecticut State Police's 94th Training Class dropped out before graduating and therefore were never trainees in the probationary working test period and that only one member of the class resigned or was terminated in 1988. On August 17, 1994, in accordance with the July 21st Order, defendants sent Professional Marshall copies of Elizabeth Pelletier's file, the trooper who voluntarily resigned from her position as a State Police Trooper effective May 6, 1988.

It is in immediate response to this production that plaintiff filed his motion for contempt and sanctions pursuant to Rule 37. Plaintiff contends that when a comparison is made between the Evans' file and the file of his classmates, it is obvious that many documents were omitted or had 'not been found' by defendants. Plaintiff asserts that as a result of the court's July 21st Order, defendants sent to Marshall, who was presumably in the middle or toward the end of his review of the documents previously produced, documents that should have been produced much earlier during discovery since defendants were required by state law to file and produce such documents.[21] Plaintiff argues that defendants' piece-meal fashion of complying with discovery made it impossible for him and Marshall to compare documents or to make statistical comparisons. Plaintiffs counsel asserts that he has expended consid-

---

**21.** The Connecticut statute reads in relevant part; "Except as otherwise provided by any federal law or state statute, all records maintained or kept on file by any public agency ... shall be public records and every person shall have the right to inspect such records promptly during regular office or business hours or to receive a copy of such records ... each such agency shall keep and maintain all public records in its custody at its regular office or place of business in an accessible place ...". C.G.S.A. § 1–19(a); see also, Lieberman v. State Board of Labor Relations. et al., 216 Conn. 253, 579 A.2d 505 (1990) ("the FOIAs general policy favoring public access has strong constitutional underpinnings. As the

United States Supreme Court has made clear, the first amendment to the federal constitution is not limited to protection of free expression but also embodies the right to receive and gain access to information and ideas ... the value or usefulness of a public employee's discipline record does not live and die with the employee dispute that gave rise to that record. To illustrate this point we need refer to only a few examples where such [state] records retain considerable value beyond the particular dispute responsible for their creation: (1) in legal proceedings brought by members of the public, such as those instituted pursuant to 42 U.S.C. § 1983 ..."). Id. at 267, 269, 579 A.2d 505.

erable time and effort examining and reexamining documents and preparing for and attending defendants' contempt hearing. Plaintiff requests the court to enter a default judgment in his favor and to award attorney fees.

■ In objection to plaintiff's motion, defendants contend that a finding of contempt and the imposition of sanctions is completely unwarranted and that Rule 37 does not grant the court authority to impose sanctions for a party's failure to obey a court order to provide or permit discovery. Defendants argue that discovery had long been completed and that they did in fact comply with the court's July 21st Order by immediately producing the documents on Trooper Pelletier. Defendants assert that the Pelletier file was only recently discovered because it had been misplaced by a retired employee.

### B. Standard

Generally, district courts possess broad power to sanction parties for abusive litigation practices that disrupt the administration of justice. *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980); *National Hockey League v. Metropolitan Hockey Club. Inc.,* 427 U.S. 639, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976). In *National Hockey,* the Supreme Court observed that "rule 37 sanctions must be applied diligently both to penalize those whose conduct may be deemed to warrant such a sanction, and to deter those who might be tempted to such conduct in the absence of such a deterrent." *Id.* at 643, 96 S.Ct. at 2781. Rule 37 provides a non-exclusive list of sanctions that may be imposed on a party for failing to obey an order to provide or permit discovery.[22] *Werbungs Und Commerz Union Austalt v. Collectors' Guild, Ltd.,* 930 F.2d 1021, 1027 (2d Cir.1991).

The mildest sanction is the reimbursement of expenses to the opposing party caused by the offending party's failure to cooperate while the harshest sanction is the order of dismissal and default judgment. *Cine Forty–Second Street Theatre Corp., v. Allied Artists Pictures Corp.,* 602 F.2d 1062, 1066 (2d Cir.1979). This Circuit has ruled that "dismissal under Fed.R.Civ.P. 37 is a drastic penalty which should be imposed only in extreme circumstances," *Salahuddin v. Harris,* 782 F.2d 1127, 1131 (2d Cir.1986) (citing *Israel Aircraft Indus., Ltd. v. Standard Precision,* 559 F.2d 203, 208 (2d Cir.1977)), and may not be imposed as a "mere penalty." *Penthouse Intern., Ltd. v. Playboy Enterprises,* 663 F.2d 371, 387 (2d Cir.1981). Dismissal or default judgment may not be imposed where the party made a good faith effort at compliance or could not comply for reasons beyond its control. *Cine Forty–Second,* 602 F.2d at 1066. However, where the non-complying party's disobedience was willful and deliberate or exemplified gross professional negligence, harsh sanctions under Rule 37 are permitted. *Id.* at 1067.

As a preliminary matter in the case now before the court, the court rejects defendants' contention that the court lacks authority to consider plaintiff's Rule 37 motion and notes that it is well within the court's powers to consider this matter although a decision on the merits of the case has already been rendered. *See, Heinrichs v. Marshall and Stevens Inc.,* 921 F.2d 418, 421 (2d Cir.1990) (it is well established that a federal court may consider independent, collateral issues-such as costs, attorney's fees, and contempt sanctions, pursuant to Rule 37-after an action is no longer pending) (quoting *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 395, 110 S.Ct. 2447, 2455, 110 L.Ed.2d 359 (1990)).

Moreover, the court also dismisses defendants' argument that Rule 37 is inapplicable since the various court orders, under consid-

---

**22.** Rule 37(b)(2) reads in relevant part; "if a party ... fails to obey an order to provide or permit discovery ... the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following: ... (C) An order ... dismissing the action, or rendering a judgment by default against the disobedient party ... (D) ... an order treating as contempt of court the failure to obey any orders except an order to submit to a physical or mental examination ... in lieu of any of the foregoing orders or in addition thereto, the court shall require the party failing to obey the order ... to pay the reasonable attorney's fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust." Fed.R.Civ.P. Rule 37(b)(2)(C), (D).

eration, were not issued pursuant to Rule 37(a) and defendants' alleged non-compliance occurred well past the pre-trial discovery phase of the case. The Second Circuit has held that "provided there is a clearly articulated order of the court requiring specified discovery, the district court has the authority to impose Rule 37(b) sanctions for noncompliance with that [particular] order." *Daval Steel Products v. M/V Fakredine,* 951 F.2d 1357, 1363 (2d Cir.1991); *Jones v. Uris Sales Corp.,* 373 F.2d 644, 647–648 (2d Cir.1967); *Penthouse Int'l.,* 663 F.2d at 382–83 (sanction of dismissal affirmed for party's noncompliance with a court order issued during trial recess and not issued pursuant to Rule 37(a)); *see also, ACLI Government Securities. v. Rhoades. et al.,* 813 F.Supp. 255, 258 (S.D.N.Y.1993). Since there was a court imposed-discovery order in this case, Rule 37 sanctions are applicable.

Lastly, although defendants also argue that sanctions are not warranted because they made a good faith effort to comply (and eventually did comply) with this court's July 21st Order which they maintain clarified the previous orders, this court finds otherwise. In determining whether sanctions are warranted, the court must weigh the full record in the case. *National Hockey,* 427 U.S. at 642, 96 S.Ct. at 2780. Defendants were previously held in contempt for not complying with this court's April 4th Order, as amended, and were given 10 days to purge themselves. Although a dispute arose between the parties over the documents defendants were required to produce within the 10 day purging period which led to the issuance of the July 21st clarifying order from the court, defendants cannot rely on this order alone and their subsequent actions to comply with this order as evidence of why they should not be sanctioned.

In looking at the full record before the court, it is clear that defendants have repeatedly failed to comply with this court's discovery orders. Approximately two weeks after the issuance of the April 4th Order, defendants informed the court that the documents were ready for the expert's review. Two months later in June, defendants were held in contempt for not complying with the

order. At the contempt hearing, when asked why defendants did not bring the documents with them, defendants' counsel asserted that the documents had just been found in a basement and would be produced once lead defense counsel returned from vacation and organized them. When a document was finally produced, it was a document that defendants were required by state law to have ready and accessible to the public, particularly in cases such as these.

The original April 4th Order made clear that the purpose of the appointment of an expert was to compare plaintiff's treatment with that of other troopers. Despite notification from the expert and plaintiff and orders from this court, defendants failed to produce meaningful comparative records, which ultimately led this court, in its decision on liability, to draw an adverse inference of discrimination against defendants. Plaintiff maintains that defendants have not provided any justification to date for their failure to comply with this court's April 4th Order while defendants seem to be asserting that they should be spared sanctioning due to their misunderstanding as to what was required of them. This court finds that sanctions against defendants are warranted, given the record before the court. The question then is the amount of sanctions which should be levied against defendants.

Given the case law, this court finds that defendants' conduct (due to alleged misunderstanding) does not rise to the level of fault or gross professional neglect required for the imposition of the harsh sanction of default judgment permitted under Rule 37. *See, Penthouse Int'l.,* 663 F.2d 371 (harsh sanction of dismissal affirmed because defendant made a mockery of discovery process by engaging in calculated and willful conduct of misrepresentations, false testimony, and failure to produce relevant documents); *Cine Forty–Second Street Theatre Corp.,* 602 F.2d at 1067 (ordinary negligence partially excusable but gross professional negligence found where party clearly should have understood his duty to the court); *see contra, Polylok Corporation v. Valley Forge Fabrics, Inc.,* 670 F.Supp. 1210, 1213 (S.D.N.Y.1987) (where defendant misunderstood the rele-

vance of a file and notified plaintiff of file the night before pre-trial order was due, rule 37 sanctions not warranted because conduct not persistent, repeated, and deliberate, as in *Penthouse* ).

However, this court does find it just to impose the sanction of reimbursement of attorney's fees against defendants for failing to comply with the court's April 4th Order. Pursuant to Rule 37(b)(2), the court directs defendants to pay plaintiff's attorney's fees for the time and services expended for such noncompliance. Since plaintiff has submitted an application for attorney's fees and has included in his fee request the expenses incurred due to defendants' disobedience of court orders, the court's consideration of the amount due to plaintiff, pursuant to Rule 37 sanctions, is included in its discussion of plaintiff's general application for an attorney's fees award.

### III. Plaintiff's Motion for Attorney's Fees as Prevailing Party

Plaintiff filed an application for attorney's fees and costs, pursuant to 42 U.S.C. § 2000e–5(k). Plaintiff's counsel also submitted a supporting affidavit setting forth the following figures; $200.00 per hour for the three attorneys who were at one point or another involved in the case and $75.00 per hour for the three legal assistants, two of whom where law students, and the third, a paralegal. Plaintiff's counsel claimed a total of 792.20 hours spent on the case as of September 30, 1996 and multiplied this amount by the fees described above to reach plaintiff's total legal costs of $136,748.60. Plaintiff argues that the factors courts consider in determining whether a party is entitled to attorney's fees are all present and warrants the granting of an attorney's fees award. Furthermore, plaintiff requests the court to adjust plaintiff counsel's legal fees of $136,748.60 with a multiplier of 1.5% to reflect a more accurate reasonable fee, thereby, bringing the amount to $205,122.90.

In objection, defendants contend that plaintiff's application is replete with excessive, redundant, unnecessary and nondescriptive entries. In regards to the request for an upward adjustment using the 1.5 multiplier, defendants cite several cases to support their argument that fee enhancements are not permitted in contingency cases brought under fee shifting statutes. In reply, plaintiff argues that the cases cited by defendants restrict enhancements when contingency alone is the factor being considered by the court and asserts that given the numerous other factors supporting his application, it is within the sound discretion of the district court to make an upward adjustment.

### A. Standard

As a general rule, a prevailing party in a federal lawsuit is not entitled to legal fees incurred during the course of the litigation. *United States v. 110–118 Riverside Tenants Corp.,* 5 F.3d 645, 646 (2d Cir.1993); *Alyeska Pipeline Serv. Co. v. Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975) (holding that federal courts could not award attorney's fees absent explicit statutory authorization). Under the employment discrimination statute, district courts are given the discretionary power to grant reasonable legal fees and costs.[23] *See, Fisher v. Vassar College,* 70 F.3d 1420, 1453 (2d Cir. 1995) (only 'prevailing party' permitted to recover attorney's fees and costs in a civil rights action). The Supreme Court has held that the language of most federal fee-shifting statutes, i.e. 42 U.S.C. §§ 1988 and 2000e–5(k), are generally the same, therefore, "our case law construing what is a reasonable fee applies uniformly to all of them." *Burlington v. Dague,* 505 U.S. 557, 562, 112 S.Ct. 2638, 2641, 120 L.Ed.2d 449, 456 (1992) (citing *Ind. Federation of Flight Attendants v. Zipes,* 491 U.S. 754, 758 n. 2, 109 S.Ct. 2732, 2735 n. 2, 105 L.Ed.2d 639 (1989)). In this matter before the court, based on the ruling on liability holding defendants liable for employment discrimination, the court finds that

**23.** 42 U.S.C. § 2000e–5(k) provides in relevant part; "In any action or proceeding under this subchapter the court, in its discretion may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee (including expert fees) as part of the costs ...". 42 U.S.C. § 2000e–5(k).

plaintiff is a prevailing party and is entitled to attorney's fees.

In determining the amount of an attorney's fees award in civil cases, district courts begin by using the 'lodestar' amount, which is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. This Circuit endorsed the lodestar method in the *Grinnell* opinions. *See, City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir.1974) (*"Grinnell I"*), *rev'd on other grounds*, 440 U.S. 568, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979); *City of Detroit v. Grinnell Corp.*, 560 F.2d 1093, 1098 (2d Cir.1977) (*"Grinnell II"*) (multiply billable hours spent on case by the hourly rate to calculate attorney's fees); *see also, Dague*, 505 U.S. at 559, 112 S.Ct. at 2369–40, 120 L.Ed.2d at 454; *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 563, 106 S.Ct. 3088, 3097, 92 L.Ed.2d 439 (1986) (*"Delaware I"*); *Hensley v. Eckerhart*, 461 U.S. 424, 434, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983) ("product of reasonable hours times a reasonable rate normally provides a reasonable attorney's fee within the meaning of the statute"). The Second Circuit has warned that attorney's fees are to be awarded "with an 'eye to moderation,' seeking to avoid either the reality or the appearance of awarding 'wind falls.'" *Beazer v. New York City Transit Authority*, 558 F.2d 97, 101 (2d Cir. 1977); *Wheatley v. Ford*, 679 F.2d 1037, 1040 (2d Cir.1982); *New York State Association for Retarded Children v. Carey*, 711 F.2d 1136, 1139 (2d Cir.1983).

## 1. Calculation of Hourly Rate

■ For the specific hourly rates, the prevailing party is "entitled to reasonable hourly rates which fall within the prevailing marketplace rates in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Cruz v. Local Union No. 3 of the International Brotherhood of Electrical Workers*, 34 F.3d 1148, 1159 (2d Cir.1994); *Polk v. New York State Department of Correctional Services*, 722 F.2d 23, 25 (2d Cir.1983). The burden is

on the fee applicant to produce satisfactory evidence, in addition to the attorney's own affidavits, showing that the requested rates are in line with those prevailing in the community for similar services. *Blum v. Stenson*, 465 U.S. 886, 896 n. 11, 104 S.Ct. 1541, 1547 n. 11, 79 L.Ed.2d 891 (1984). Additionally, the community to which the district court should look is the judicial district in which the court sits. *Cruz*, 34 F.3d at 1159.

The attorney in this case failed to submit any additional evidence, beyond his own affidavits, establishing the prevailing rates for similar services rendered in the relevant community. Therefore, this court looks to attorney's fees granted in cases in the District of Connecticut [24] and uses its own knowledge of similar cases to determine what is a reasonable rate. *Miele v. New York State Teamsters Conference Pension & Retirement Fund*, 831 F.2d 407, 409 (2d Cir. 1987) (trial judge may rely on his or her knowledge of prevailing community rates). Cases in the District of Connecticut reveal what has been considered reasonable rates for attorneys, paralegals, and law students in this community. *See, G.R., et al. v. Regional School District # 15*, 1996 WL 762324 (D.Conn.1996) ($225.00 per hour is reasonable rate for attorney); *Natale v. City of Hartford*, 1989 WL 132542 (D.Conn.1989) ($50.00 per hour is reasonable for paralegal or law clerk); *Gibbs v. Southeastern Investment Corp.*, 705 F.Supp. 738 (D.Conn.1989).

The amount of any award, however, must ultimately be determined by looking to the facts of the particular case. *Hensley, supra*, 461 U.S. at 429, 103 S.Ct. at 1937. In this case, based on the contingency and risk of nonpayment, extent of success achieved, and the years of experience of plaintiff's attorney,[25] *see also, United States Football League v. National Football League*, 887 F.2d 408, 415 (2d Cir.1989); *Cruz*, 34 F.3d at 1160, the court determines that Attorney Laviano's rate of $200.00 per hour for the three attorneys (including himself) is reasonable. The court finds that $50.00 per hour for the paralegals and the two law students involved

---

**24.** This action was commenced in the District of Connecticut with Judge Motley sitting by designation.

**25.** *See, Hensley* factors, Infra, n. 26.

in the litigation in this case is a reasonable rate. *Missouri v. Jenkins,* 491 U.S. 274, 285–86, 109 S.Ct. 2463, 2470–71, 105 L.Ed.2d 229 (1989) (law student is compensable in an award of attorney's fees); *Chambless v. Masters, Mates & Pilots Pension Plan,* 885 F.2d 1053, 1058 (2d Cir.1989).

■ Laviano has calculated the lodestar amount by multiplying his hourly rates to the number of hours (792.20) he and his staff have put into this case, reaching a total of $136,748.60. He asks the court to adjust this amount upwardly with a 1.5 multiplier and to award the resulting sum of $205.122.90. Although the *Hensley* Court noted that lodestar calculations may not end the inquiry of reasonable attorney's fees because there may "remain other considerations that [could] lead the district court to adjust the fee upward or downward," 461 U.S. at 434, 103 S.Ct. at 1940, there is a strong presumption that the lodestar is reasonable. *Dague,* 505 U.S. at 561–63, 112 S.Ct. at 2641, 120 L.Ed.2d at 456; *Lunday v. Albany,* 42 F.3d 131, 134 (2d Cir.1994). The party asking the court to depart from the lodestar amount bears the burden of proving that such a departure is necessary to the calculation of a reasonable fee. *See, Grant v. Martinez,* 973 F.2d 96, 99 (2d Cir.1992); *Dailey v. Societe Generale,* 915 F.Supp. 1315 (S.D.N.Y.1996).

An upward adjustment is only justified in rare instance where the fee applicant offers "specific evidence [showing] that the quality of service rendered was superior to that one reasonably should expect in light of the hourly rates charged and that the success was 'exceptional.'"[26] *Hensley,* 461 U.S. at 435, 103 S.Ct. at 1940; *Blum,* 465 U.S. at 897, 104 S.Ct. at 1548 (in some cases of exceptional success an enhanced award may be justified). The Supreme Court has held that novelty and complexity of issues, quality of representation, special skill and experi-

ence of counsel, results obtained, and a contingency fee arrangement and risk of nonpayment are most often reflected in the lodestar calculation and cannot serve as independent bases for adjusting the basic fee award. *Id.* at 899–901, 104 S.Ct. at 1549–50; *see also, Pennsylvania v. Delaware Valley Citizens Council,* 483 U.S. 711, 726–27, 107 S.Ct. 3078, 3087–88, 97 L.Ed.2d 585 (1987) (*"Delaware II"*) (risk of nonpayment not a basis for upward adjustment of attorney's fees because it prevents windfall to attorneys since risk is considered in determining the lodestar amount); *Dague, supra,* 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449 (enhancement based on contingency is incompatible with fee shifting statutes and is therefore impermissible); *Knudsen v. U.S.,* 966 F.2d 733 (2d Cir.1992); *Luciano v. Olsten Corporation,* 109 F.3d 111, 115–16 (2d Cir. 1997); *Maywalt v. Parker & Parsley Petroleum Co.,* 864 F.Supp. 1422, 1435 (S.D.N.Y. 1994) (lack of exceptional circumstances to warrant fee enhancement); *Amalgamated Clothing & Textile Workers Union v. Wal-Mart Stores,* 1994 WL 74871, at *6 (S.D.N.Y. 1994) (multiplier not justified based on contingency risk alone).

In this case, because many, if not all, of the factors plaintiff presented in his application for attorney's fees are subsumed within the initial lodestar calculation, the court denies plaintiff's request to apply the 1.5 multiplier. *See, Orchano v. Advanced Recovery, Inc.,* 107 F.3d 94 (2d Cir.1997) (if *Hensley* factors largely considered in lodestar calculation, "those factors should not occasion a duplicative adjustment to the lodestar"). Moreover, plaintiff provides no additional or specific evidence or argument supporting an upward adjustment. As the court has previously noted, Laviano's conduct in this case has been

---

**26.** In determining whether to adjust the lodestar amount, the *Hensley* Court held that the district court may consider the 12 factors identified in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–19 (5th Cir.1974) which are; (1) time and labor required; (2) novelty and difficult of the question; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorney; (10) the 'undesirability' of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar case. *Id.* at 434 n. 9, 103 S.Ct. at 1940 n. 9.

far from 'superior' or 'exceptional'.[27] The court finds that a multiplier is not warranted in this case.

## 2. Assessment of Reasonable Hours Expended

Central to the application for attorney's fees is the submission of time records reflecting the time expended, by whom, and, for what, so that the court can determine whether the hours expended were reasonable. Such records must be made contemporaneously with the associated work and reconstruction of such work and billing on a computer is adequate. *See, Cruz,* 34 F.3d at 1160; *Lewis v. Coughlin,* 801 F.2d 570, 577 (2d Cir.1986); *Carey, supra,* 711 F.2d at 1148 (records should specify, the date, the hours expended and the nature of work done). The "burden is on counsel to keep and present records from which the court may determine the nature of the work done, the need for and the amount of time reasonably required; where adequate contemporaneous records have not been kept, the court should not award the full amount requested." *F.H. Krear & Co. v. Nineteen Named Trustees,* 810 F.2d 1250, 1265 (2d Cir.1987) (rejecting time records with one description for an entire days work); *Hensley,* 461 U.S. at 437 n. 12, 103 S.Ct. at 1941 n. 12 (counsel not required to record in great detail how each minute of his time was expended but should identify the general subject matter of his time expenditures).

In calculating the number of 'reasonable hours,' the district court looks to its own familiarity and experience with the case as well as to the evidence submitted and arguments made by both parties. *DiFilippo v. Morizio,* 759 F.2d 231, 234 (2d Cir.1985); *Clarke, supra,* 960 F.2d at 1153. District courts must exclude hours that were not 'reasonably expended,' *DiFilippo,* 759 F.2d at 235; *Lunday v. City of Albany,* 42 F.3d 131, 133 (2d Cir.1994), or were excessive, redundant, or otherwise unnecessary. *See, Orchano,* 107 F.3d at 98. In this case, plaintiff's counsel has submitted computerized billing records of daily time sheets, made contemporaneously with the task performed, which generally describe and indicate the time spent in tenths of hours.

Defendants contend that several of the entries are not properly documented in that they are nondescriptive, vague, and repetitive and, as a result, has requested a hearing on plaintiff's application for attorney's fees. Both parties were informed that a future hearing on attorney's fees would be scheduled only if deemed necessary.[28] This court finds that a future hearing on plaintiff's application for attorney's fees is not necessary given the evidence before the court. *See, Hensley,* 461 U.S. at 437, 103 S.Ct. at 1941 ("[a] request for attorney's fees should not result in a second major litigation").

**27.** As a matter of fact, when plaintiff commenced this action against the State through Laviano, the complaint failed to name a state official being sued in his official capacity which is permitted in Title VII cases. *See, Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976) (When Congress, acting under section 5 of the Fourteenth Amendment authorizes federal courts to award money damages in favor of a private individual against a state, state entities, or state officials guilty of discrimination under Title VII, Eleventh Amendment sovereign immunity is no bar); *see also, Trotman v. Palisades Interstate Park Commission,* 557 F.2d 35, 38 (2d Cir.1977); *Santiago v. New York State Department of Correctional Services,* 945 F.2d 25, 30 (2d Cir.1991); *Minotti v. Lensink,* 798 F.2d 607, 609 (2d Cir. 1986); *In re: 995 Fifth Avenue Associates, et al., v. New York State Department of Taxation and Finance,* 963 F.2d 503, 507 (2d Cir.1992). When the court directed Laviano to name a state official (the Police Commissioner in his official capacity) who could answer or be held in contempt

for the difficulty in obtaining (and failure in producing) relevant documents and files from the state, Laviano said he would adhere to the court's directive but found it necessary, for whatever reason, to inform the court that the Police Commissioner was his trial practice professor in law school. (See Transcript of Contempt Hearing, dated June 22, 1994, 13–15).

**28.** Both parties were put on notice by order dated August 13, 1996 that attorney's fees would be addressed at the hearing on damages. Plaintiff's counsel submitted a computerized print out of hours expended on the case up to and including September 30, 1996, on October 4, 1996. Defendants did not submit a reply to plaintiff's application for attorney's fees prior to or at the hearing on damages. At the hearing, the court granted defendants time to reply to plaintiffs application and noted that a further hearing on fees would be held only if there was a real dispute. (Tr., 121–124).

Defendants take specific objection to entries designated as "review of file" or "research and/or analysis." Although district courts are not required to "set forth item-by-item findings concerning what may be countless objections to individual billing items," *Lunday,* 42 F.3d at 131, this court notes that most of the entries so designated were adequate because they were immediately followed by a brief description of the matter to which review of the file or research related. The hours for entries dated 12/14/90, 4/20/92, 5/13/92, 5/13/94, 1/9/95, and 12/11/95 are deducted from the total number of hours expended because they do not provide a description of or purpose for the work done, thereby reducing the total number of hours expended to 769.90.

Upon a more detailed examination of the entries, this court finds, however, that a substantial number of the entries are not adequately descriptive, due to their failure to designate who performed the particular task being billed. The court notes that there is absolutely no excuse for such neglect, particularly given Laviano's years of practice in this area. In *Carey,* 711 F.2d at 1148, the Court considered not awarding any attorney's fees due to plaintiff attorney's failure to keep accurate and contemporary time records; however, the court found that it would be unfair not to award fees in that particular case, reasoning that confusion may have arisen from recent Second Circuit decisions, as to whether non-profit law offices, like plaintiffs in that case, had to keep the same type of records required of private practitioners.

For the specific purpose of addressing such confusion, the court mandated that any attorney applying for court-ordered compensation in this Circuit must submit contemporary time records that "specify, *for each attorney,* the date, the hours expended, and the nature of the work done." *Id.* (emphasis added). In this case in the majority of his entries, Laviano designates either himself, one of the other attorneys, the law students or the paralegal as the person performing the task by marking the entry with the respective initials. However, in those entries

without a designation of who performed the task, the court is unable to determine what hourly rate should be charged. Therefore, the court deducts 126.10 hours which is the sum of the total number of hours in entries failing to designate a specific person for the performance of the task from the 769.90 total, thereby reducing the total number of hours expended to 643.80.

Lastly, this court finds that the 643.80 hours should be reduced further by 10% due to the multiple duplicative entries contained in plaintiff's application. The court finds that although the litigation of this case spanned over a decade, there were no novel legal issues or complex and confusing evidentiary findings which may have required extensive review and research. Laviano's performance before the court did not reflect such extensive review and research. Therefore, the number of hours of preparation claimed seems excessive to this court. For example, from December, 1988 to January 12, 1994, Laviano claims, in his time records, that he expended approximately 260 hours preparing the case for trial; this court notes that Laviano did not even subpoena any documents until after the trial began, despite his burden of establishing a prima facie case of discrimination. (See Transcript of Contempt Hearing, date June 22, 1994, p. 6).

The Second Circuit has affirmed district court reductions of voluminous fee applications as an alternative to district courts unrealistically evaluating and ruling on every questionable entry. *See, Carey,* 711 F.2d at 1146 (citing *Kane v. Martin Paint Stores, Inc.,* 439 F.Supp. 1054, 1056 (S.D.N.Y.1977) (10% cut), *aff'd mem.,* 578 F.2d 1368 (2d Cir.1978); *Ross v. Saltmarsh,* 521 F.Supp. 753, 761–62 (S.D.N.Y.1981) (5% and 10% cuts), *aff'd mem.,* 688 F.2d 816 (2d Cir.1982)). Therefore, this court reduces the 643.80 hours by 10% to reach 579.42, an amount the court deems a more reasonable representation of the hours expended in this case. By multiplying this amount by the hourly rates the court found appropriate, the court rules that plaintiff is entitled to $89,046.00 in attorney's fees.[29]

---

**29.** The court decreased the amount of hours credited to Laviano and the other attorney's (445 hours) and the amount credited to the law students/paralegal (198.8 hours) by 10%, multiplied

The court granted both sides an opportunity to submit objections to the court's findings of facts and conclusions of law in its May 12, 1997 opinion on damages. With plaintiff's objections, plaintiff submitted a supplemental application for attorney's fees and costs in the amount of $16,180.72.[30] The court grants this amount and finds that plaintiff is thereby entitled to a total of $105,226.72 in attorney's fees and costs.

## CONCLUSION

For the reasons set forth herein, this court finds that plaintiff is entitled to $772,027.08 in backpay and pre-judgment interest and is entitled to $105,226.72 in attorney's fees, which includes plaintiff's counsel's reimbursement pursuant to Rule 37.

SO ORDERED.

the resulting figures by the respective hourly rates of $200.00 and $50.00, and added these totals together to reach the attorney's fees award.

30. With the supplemental fee application, Laviano submitted a sufficiently detailed computerized print out of hours expended on the case since September 30, 1997. Laviano claims 37.2 hours at $200.00 per hour for himself and 2.8 hours at $50.00 for his assistant, amounting to $7440.00 in attorney fees. The remaining $8600.72, of the total amount requested, covered the expert's (Dr. Woundy) fees. A supporting affidavit detailing the date, time, and purpose of each charge was submitted.